**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| PAUL L. BROWNING, *Petitioner-Appellant*, <br><br> v. <br><br> RENEE BAKER, Warden; ADAM PAUL LAXALT, Attorney General of the State of Nevada, *Respondents-Appellees*. | No. 15-99002 <br><br> D.C. No. 3:05-cv-00087-RCJ-WGC <br><br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, Senior District Judge, Presiding

Argued and Submitted March 16, 2017
San Francisco, California

Filed September 20, 2017
Amended November 3, 2017

Before: Kim McLane Wardlaw, Ronald M. Gould,
and Consuelo M. Callahan, Circuit Judges.

Order;
Opinion by Judge Gould;
Dissent by Judge Callahan

## SUMMARY[*]

### Habeas Corpus

The panel filed an order in which (1) Judges Wardlaw and Gould amended their September 20, 2017, majority opinion in Paul Browning's appeal from the denial of his habeas corpus petition; (2) Judge Callahan objected to any basis for expanding the COA, and stood by her dissent; and (3) the panel denied a Petition for Panel Rehearing.

In the opinion, the panel affirmed the district court's denial of Browning's habeas corpus petition as to his escape conviction; reversed the district court's denial of the petition as to Browning's convictions of burglary, robbery with the use of a deadly weapon, and murder with the use of a deadly weapon; and remanded for further proceedings.

Browning contended that the prosecutor withheld material evidence favorable to the defense in violation of his constitutional rights as described in *Brady v. Maryland*, 373 U.S. 83 (1963), and presented false and misleading evidence at trial in violation of his constitutional rights as described in *Napue v. Illinois*, 360 U.S. 264 (1959). The panel held that an officer's shoeprint observation, a witness's expectation of a benefit for his testimony, and the precise description of the assailant's hairstyle received from the victim were all favorable to Browning under *Brady*. The panel held that Browning's *Napue* claim fails because it was not clearly established at the time of Supreme Court of Nevada's

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

decision that a police officer's knowledge of false or misleading testimony would be imputed to the prosecution. For the *Brady* evidence, except for the witness's expectation of a benefit for his testimony, the Supreme Court of Nevada did not explicitly address whether this evidence was favorable to Browning. The panel held that had the Supreme Court of Nevada not viewed the evidence as favorable to the defense, it would have been an unreasonable application of Supreme Court precedent. The panel also held that it was an objectively unreasonable application of Supreme Court precedent to hold that the *Brady* materiality standard was not met here, and therefore concluded that the district court should have granted habeas relief on Browning's *Brady* claims.

Browning also contended that he was denied his right to effective assistance of trial counsel due to inadequate pretrial investigation and preparation. Granting Browning's motion to expand the certificate of appealability, and explaining that the court considers counsel's conduct *as a whole* to determine whether it was constitutionally adequate, the panel wrote that the district court erred by limiting the COA to particular "claims" that counsel's failure to investigate particular avenues of evidence were deficient. The panel held that Browning's trial counsel unreasonably failed to investigate Browning's case, and that the Supreme Court of Nevada unreasonably concluded that Browning failed to prove just that. The panel amended the opinion to state that because Browning's ineffective of assistance of counsel claims succeed on other grounds, it need not address other alleged deficiencies argued by Browning in support of an expansion of the COA. The panel held that the Supreme Court of Nevada's conclusion that any deficient performance did not prejudice Browning was objectively unreasonable.

The panel concluded that Browning is entitled to a writ of habeas corpus with respect to his convictions of burglary, robbery with the use of a deadly weapon, and murder with the use of a deadly weapon. The panel wrote that Browning is not entitled to relief as to his escape conviction because he offered no reason to call its validity into question.

Dissenting in part, Judge Callahan wrote that a meaningful application of the deferential standard of review under AEDPA compels the conclusion that the Nevada Supreme Court was not objectively unreasonable in rejecting Browning's ineffective assistance of counsel claim as well as his claims under *Brady* and *Napue*.

## COUNSEL

Timothy K. Ford (argued) and Tiffany Cartwright, MacDonald Hoague & Bayless, Seattle, Washington; Mark A. Larrañaga and Jacqueline K. Walsh, Walsh & Larrañaga, Seattle, Washington; for Petitioner-Appellant.

Victor-Hugo Schulze II (argued), Senior Deputy Attorney General; Thom Gover, Chief Deputy Attorney General; Adam Paul Laxalt, Attorney General; Office of the Attorney General, Las Vegas, Nevada; for Respondents-Appellees.

Maureen P. Alger and Lori R. Mason, Cooley LLP, Palo Alto, California; Reed A. Smith, Cooley LLP, New York, New York; for Amicus Curiae The Innocence Network.

## ORDER

Judges Wardlaw and Gould **AMEND** their majority opinion in the above captioned case filed September 20, 2017 as follows:

The paragraph on page 55 of the slip opinion that begins with the sentence <Finally, Browning lists in a footnote of his brief a litany of other asserted deficiencies in Pike's representation.> shall be deleted in its entirety and replaced with the following language:

<Finally, in arguing for an expansion of the COA, Browning lists a number of other alleged deficiencies in Pike's representation. Because we find that Browning's ineffective assistance of counsel claim succeeds on other grounds, we do not here assess these other alleged deficiencies.>

Existing footnote 19 shall be inserted in its entirety after <Pike's representation.> in the above-inserted text.

Judge Callahan objects to any basis for expanding the COA, does not concur in amending the majority opinion, and stands by her dissent.

Judges Wardlaw, Gould, and Callahan vote to deny the Petition for Panel Rehearing.

The Petition for Panel Rehearing is **DENIED**. No further petitions for panel rehearing or rehearing en banc will be accepted.

**IT IS SO ORDERED.**

**OPINION**

GOULD, Circuit Judge:

Nevada state prisoner Paul Browning appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. In 1986, a Nevada jury found Browning guilty of four crimes involving the robbery and murder of Hugo Elsen in a Las Vegas jewelry store. The jury sentenced Browning to death.

In his habeas corpus petition, Browning challenges his convictions. He asserts that he is entitled to habeas relief on two grounds: prosecutorial misconduct and ineffective assistance of trial counsel ("IAC"). Browning contends that the prosecutor in his case withheld material evidence favorable to the defense and presented false and misleading evidence at trial. He also contends that his trial counsel's pretrial investigation and preparation were constitutionally inadequate. The Supreme Court of Nevada previously rejected these claims.

Under this procedural posture, a federal court's role is limited. Our role is only "to guard against extreme malfunctions in the state criminal justice systems." *Davis v. Ayala*, 135 S. Ct. 2187, 2202 (2015) (internal quotation marks omitted). In Paul Browning's case, a mixture of disturbing prosecutorial misconduct and woefully inadequate assistance of counsel produced just that. Because the Supreme Court of Nevada unreasonably applied clearly established Supreme Court precedent in denying some of Browning's claims, we reverse the district court's denial of habeas relief and remand for further proceedings.

# I

We start with the factual background: Between 4:00 p.m. and 4:30 p.m. on November 8, 1985, Hugo Elsen was stabbed to death during a robbery of the jewelry store he operated with his wife, Josy Elsen. Soon after this brutal murder, police officers arrested Paul Browning as the primary suspect. Browning was staying at the Normandy Motel, located a few blocks from the Elsens' store. The state charged Browning with (1) burglary, (2) robbery with the use of a deadly weapon, (3) murder with the use of a deadly weapon, and (4) escape. Because the public defenders' office was representing a potential witness in Browning's case, the court appointed former Clark County prosecutor Randall Pike to represent Browning. At the time of his appointment, Pike had been practicing as a defense attorney for less than a year. He represented in a state habeas proceeding that Browning may have been his first capital defendant.[1]

Browning pleaded not guilty. The court scheduled trial for March 3, 1986. A week before that date, the prosecution requested a continuance, explaining that it was not prepared to begin trial because someone in its office had written the wrong trial date in the case file. Over the defense's objection, the court granted the continuance. Because of the delay, Browning sought dismissal of his case from the Supreme Court of Nevada and federal court. He was unsuccessful. In the meantime, Pike lost contact with Browning's girlfriend, Marsha Gaylord—an essential witness for Browning's trial defense, according to Pike. Trial commenced on December 9, 1986, with Gaylord still unreachable.

---

[1] In contrast, Pike had prosecuted four death penalty cases in his three years working for the Clark County district attorney.

**A**

The prosecution's first witness was Josy Elsen, the spouse of the victim. Josy testified that in the late afternoon of November 8, 1985, she was napping in a back room of the jewelry store when she heard commotion in the showroom. She awoke, entered the showroom, and saw a black man with a blue cap holding a knife and kneeling over Hugo. Hugo and the assailant were in the opposite corner of the room, and a showcase stood between them and Josy. All Josy could see was the side of the assailant's head and hair that "puffed" out of the back of his cap. Josy at once ran through the back door of the jewelry store, knocked on the window of an office next door, and asked the occupants to call the police. Debra Coe, an employee in that office, then accompanied Josy back into the jewelry store through the back entrance; victim Hugo was lying in the same corner in a pool of blood, but the assailant was gone. Later that night, police brought spouse Josy to a station, where she positively identified many pieces of jewelry as coming from her store. At trial, Josy identified a picture of a blue hat with the word "Hollywood" written on the front as the one she saw the assailant wearing in the showroom.

Josy testified that in December 1985, a month after Hugo's murder, police called her back to the station and presented her with a photographic lineup of twelve black men. The officers placed Browning's picture—taken in November 1985—in the "#5" position. According to an officer's report, Josy "immediately" explained to the officers that she thought she would not be able to identify the assailant because "she only saw him for a very slight moment from the side." Nonetheless, Josy examined the photos and stated that the men in photos #1, #6, and #11 had hair

"somewhat like" the assailant's. She did not then indicate any recognition of Browning's photo. Yet at trial, when Josy was asked to identify the man who had killed Hugo, she said that, although she had a limited view of the assailant, she was certain that it was Browning.

The prosecution also called a business neighbor and witness, Debra Coe. Coe testified that when Josy Elsen frantically arrived at Coe's office, Coe ran to the front window to see if she could see anyone leaving the Elsens' store. Coe saw a man run by her office from the direction of the jewelry shop, but later that day told the officers that the man had not come out of the Elsens' store and instead "must have run past it." She told the officers that it was "hard for [her] to see how he could've come out of the door and was running at the angles he was at." She initially told the officers that the man she saw was white, but in a later interview the same day said he was "definitely black." In the interview, Coe stated, "when I see a black person, that they all look the same." At trial, Coe described the man as black, about six feet tall and 27 years old, with a mustache and hair sticking out about an inch beyond a blue cap. She also said he was wearing Levi's and a dark blue jacket. When asked at trial if she truly believed that all black people "look the same," Coe said she did not. Coe admitted, however, that she did not "really know any black persons personally."

Coe testified that later on the evening of November 8, an officer asked her to accompany him around the corner to "identify the man that they had picked up." Coe obliged, and a minute or two later, an officer pulled up in a police vehicle. The police first showed her someone whom Coe stated was "definitely not" the man she had seen. The officers then presented Browning, who was shirtless and in handcuffs.

Browning had a large Afro-style haircut. Coe indicated to the officers that she "thought" Browning was the person she had seen running by her office, but she "would have been able to identify him better if he had the hat on and the jacket." According to Coe, during the showup, Browning's hair was "pressed down" as if he had been wearing a hat.

At trial, Coe testified that she was now "sure" Browning was the man she had seen running by her office on November 8, 1985. When Pike asked her how, a year after her equivocal identification on the night of the crime, she was so sure that it was Browning that she had seen, Coe stated that she had "had time to think about it." Coe also identified the blue "Hollywood" hat as the one worn by the man who ran by her office.

The prosecution also called Charles Woods, who in 1985 operated a jewelry store three doors down from the Elsens' store. Woods was standing outside his store with a friend around 4:30 p.m. when he saw a man jogging towards him. The man was not holding anything, and had no blood on him. The man passed Woods within touching distance. Woods told police that the man he saw was about six-feet tall, slim, muscular, about 180 pounds, and was wearing dark pants, a light-colored shirt, and a "darker color" hat. When shown a picture of the Hollywood hat at trial, Woods said that it was not the hat he saw the man wearing, which was more of a "beret sort of thing."

Woods testified that the officers at the scene asked him to join Coe at the nearby corner to "stick around and identify" a suspect. When police presented Woods with a shirtless and handcuffed Browning, Woods identified Browning as the man who ran by Woods earlier that day.

The prosecution then called Randy Wolfe. Randy and his wife, Vanessa Wolfe, lived in the same motel where Browning was staying. Randy testified that between 4:00 p.m. and 4:30 p.m. on November 8, 1985, he was working on his landlady's car when Browning yelled his name from the motel's upper level. Randy went upstairs and found Browning in the Wolfes' apartment sitting on the bed and wearing a tan windbreaker and the Hollywood hat. Jewelry had been dumped on the bed. According to Randy Wolfe, Browning told Randy that he had just robbed a jewelry store and thought he had killed someone. Browning also told Randy that he planned to use the jewelry to get Gaylord out of jail. Randy told Browning that he wanted nothing to do with the murder, and was going to go finish working on his landlady's car and then get some heroin. Browning asked if Randy would get some heroin for him too. On his way down the stairs, Randy encountered Vanessa, whom he instructed to keep Browning "cool" while Randy found the police. Randy then located the crime scene and led several officers back to his apartment. Randy testified that when the officers got there, they promptly arrested Browning, and that after they removed Browning from the apartment, Randy found a cup under his sink filled with additional jewelry.

Randy Wolfe made several admissions during his testimony that bore on his credibility. He admitted that he and Vanessa were addicted to heroin and cocaine, and that he would break into cars to support their habits. He had prior convictions for selling a controlled substance and prison escape. He also admitted that he had kept some of the jewelry he claimed he found under his sink, and lied during Browning's preliminary hearing by stating that he did not keep any of it.

Before the time of Browning's trial, Randy had been charged with possession of stolen property, a charge unrelated to the Elsens' stolen jewelry. Prior to Randy's testimony at trial in Browning's case, the state permitted Randy to plead to a lesser charge of attempted possession of stolen property, for which he faced one to five years in prison. Despite Randy Wolfe's failure to appear in court almost thirty times in the past, he was released on his own recognizance before Browning's trial. Randy Wolfe testified, however, that he had not received "anything" for his testimony against Browning, and that no one had promised that his sentence might be "diminished" if he testified. The prosecutor in Browning's case, Daniel Seaton, was not the prosecutor in Randy's case.

The prosecution next called Vanessa Wolfe. Around 1977, Vanessa and Gaylord, Browning's girlfriend at the time of the murder, had lived in southern California, where they ran con games and "bilk[ed] people out of their money." At the time of Browning's trial, Vanessa worked as a prostitute in Las Vegas. On the afternoon of November 8, 1985, Vanessa was bringing a client to the Wolfes' apartment when she encountered Randy on the stairs. Randy told Vanessa about what Browning had done, and that Browning was going to take Vanessa hostage if Randy called the police. Vanessa then entered the apartment. Browning was inside, shaking water off of a knife. The Hollywood hat and tan windbreaker were on the floor. Browning instructed Vanessa to throw the knife and hat on the roof, but instead she put the knife in a pizza box under the stairs and threw the hat in a dumpster. Police arrived soon after.

Officer David Radcliffe also testified for the prosecution. He said that he arrived at the Elsens' store to find Hugo Elsen

conscious, but in an "extremely serious" condition. Hugo told Radcliffe that a black man wearing a blue baseball cap had stabbed him. Radcliffe then joined some officers standing outside of the storefront, and soon after, Randy Wolfe approached him. Radcliffe had known Randy for several years because Randy was a regular narcotics user. Randy led Radcliffe and several other officers to Randy's apartment, which the officers forcibly entered. Inside, they found Browning sitting on the corner of the bed. Pieces of jewelry were scattered along the floor on the opposite side of the room from the bed.

The prosecution also called several forensics specialists to testify about evidence at the crime scene. Identification specialist David Horn testified that three of the showcase counters in the store had been "disturbed," and that the merchant-side sliding glass of one of the showcases had been broken. Horn lifted "approximately twenty some odd" fingerprints from the scene. Two were most relevant: one from the top glass of one of the counters, and another from a fragment of the counter's broken sliding-glass door. A different fingerprint examiner concluded that these two prints matched Browning's.

Horn also testified that he observed bloody tennis shoe-style shoeprints leading away from the corner where Hugo was lying and towards the store's front door. After leaving the scene, Horn compared the shoeprints to the loafers Browning was wearing when he was arrested; they did not match. Horn testified that paramedics and off-duty officers often wear tennis shoes at crime scenes, so he did not think any further investigation into the source of the shoeprints was necessary.

State criminalist Minoru Aoki testified that Hugo had Type B blood. Blood had been found on the tan jacket that was lying on the floor in the Wolfes' apartment, and it too was type B. Aoki did not test Randy Wolfe or Vanessa Wolfe's blood type.

Pathologist Giles Green testified that the knife recovered from the pizza box under the stairs at the Normandy Motel was "consistent" with the wound configurations in Hugo's body, but "nothing about that knife t[old him] that the knife made those wounds."

Browning's trial counsel, Randall Pike, called three witnesses. First was Bradley Hoffman, who operated a store two doors down from the Elsens' store. Hoffman testified that around 4:00 p.m. on the day of the crime, he saw a man walking down the street towards the Elsens' store. The man was Cuban, "probably five seven, slight build," and wearing Levi's jeans, the shirt that Hoffman vaguely recalled as plaid, and a blue baseball cap. Later that night, officers brought Hoffman to the showup with Coe and Woods, and presented him with a shirtless Browning. Hoffman stated that Browning's hair, a "medium sized Afro," did not appear as though Browning had recently been wearing a hat. He also stated at trial that the Hollywood hat was not the one worn by the man he saw walking towards the Elsens' store.

Pike also called Officer Gregory Branon, who testified that he was "one of the first two officers" to arrive at the scene. Branon received a description of the suspect: a "black male, adult in his late twenties, wearing a blue baseball cap, blue windbreaker-type jacket, blue Levi's[,] . . . medium complexioned, bore a mustache and what was described as a

shoulder length J[h]eri-type curl." Pike did not ask Branon who gave him that description.

Last, Pike called Annie Yates—a hair stylist—who testified to the difference between a Jheri Curl (the assailant's hairstyle as described to Officer Branon), and an Afro (Browning's hairstyle on November 8, 1985). Yates stated that a Jheri Curl requires the use of chemicals, whereas an Afro does not. Pike presented Yates with the twelve-person photographic array previously shown to Josy Elsen, which had Browning at position #5. Yates stated that pictures #1, #2, #4, and #10 had Jheri Curls.

In his closing, Seaton laid out his theory: Browning robbed the jewelry store to bail Gaylord out of jail because he relied on her prostitution income to feed his heroin addition. Seaton's closing argument was incendiary, but Pike rarely objected. Seaton began by characterizing the presumption of innocence as follows:

> Now we are talking about that wonderful constitutional element called the presumption of innocence, we are now talking about piercing that veil, dropping that facade because, in fact, as a person sits in a courtroom he may not be innocent. He may be guilty.

> [Browning] has the presumption of innocence. And, of course, it is one when his guilt is shown that the farce of that presumption is known and it's been done in this case.

Seaton gave the following description of Browning's murder of Hugo Elsen:

> [Browning, t]his man whose girlfriend prostituted for him so he could get drugs, money to get drugs, this man who took heroin, he wanted Randy Wolfe to get him to cop some heroin for him after the murder. He shot the life of Hugo Elsen right up his arm. That's what he was doing that day. That's what we have here.

Seaton also described Josy Elsen's identification of Browning at trial as "as good as you can ask for." Anticipating that Pike would argue that Browning's hair on the night of the murder (an Afro) did not match the assailant's hairstyle as described to Officer Branon (a Jheri Curl), Seaton explained that Officer Branon received the description from "some white person" who did not understand "the true definition" of a Jheri Curl. Seaton concluded by saying that it was the jury's "duty to go out, decide that and come back in here and tell [Browning] just exactly that, that he's the one that has to pay for these crimes."

Pike's closing argument set forth a theory that the Wolfes' friend, a Cuban man, committed the robbery-murder, and the Wolfes were now framing Browning.

The jury found Browning guilty on all four counts[2] and sentenced him to death. Browning directly appealed to the Supreme Court of Nevada, which affirmed. *Browning v. State*, 757 P.2d 351 (Nev. 1988).

## B

Browning filed a petition for a writ of habeas corpus in Nevada state district court, arguing in relevant part that Seaton had withheld exculpatory evidence from the defense and that Pike was ineffective by failing to perform an adequate investigation before trial. The petition included three new pieces of evidence. First, the state stipulated that post-conviction DNA analysis had proven that the blood on the tan windbreaker found in the Wolfes' apartment did not belong to Hugo Elsen. Second, a forensics report indicated that Hugo Elsen's wounds did not "coherently coincide" with the knife found in the pizza box under the stairs at the Normandy Motel. Third, a forensics report suggested that the bloody shoeprints were too large to belong to Josy Elsen or Debra Coe.

The Nevada district court held an evidentiary hearing, at which attorneys Jason Isaacs and Daniel Lamb represented Browning. Robert Shomer, a forensic psychologist, testified that Josy Elsen's identification of Browning as the assailant was questionable because (1) her in-court identification of

---

[2] The prosecution also presented evidence that once Browning was brought to the police station on the night of November 8, 1985, he escaped from the interview room where he was being held. He was caught before he left the police station building. As explained below, *see* Section V, *infra*, because Browning's petition provides no basis for challenging his escape conviction, our analysis focuses only on his robbery- and murder-related convictions.

Browning was 14 months after the incident; (2) the stress of the moment might have made her memory more vivid, but no more accurate; (3) the in-court identification was extremely suggestive because Browning was the sole available "choice"; (4) cross-racial identifications are unreliable (Josy is white, Browning is black); and (5) Josy's observation of Browning's picture during the photo array in December 1985 may have implanted Browning's face in Josy's memory and prompted a false in-court identification. Shomer also criticized Coe's identification, explaining that (1) the 14-month gap between Coe's observations and the trial likely distorted her memory; (2) Coe initially reported to the police that the man she saw did not appear to come from the Elsens' store, and Shomer suggested that Coe probably did not focus intently on his characteristics; (3) Coe had reported to the police that the man she saw was white, but one of the officers' statements to Coe that the suspect was black might have impacted Coe's memory; and (4) given the highly suggestive procedures of the in-person showup on the night of November 8, 1985, Coe's identification was, at best, equivocal. Finally, Shomer criticized Woods's identification because (1) Woods stated that he saw nothing notable about the man who ran towards him on the afternoon of November 8, 1985, suggesting that Woods did not pay close attention to the man's appearance; and (2) the showup was particularly suggestive in light of the officers' telling Woods that they had a suspect whom they wanted Woods to identify.

Browning's counsel then called Michael Sweedo, a fingerprint examiner and crime scene analyst, to give his opinion on the officers' forensic investigation. Sweedo testified that Browning's fingerprints on the showcase glass could have been the result of Browning leaning over the case. Sweedo noted that it was unusual that there were no other

identifications on the remaining twenty-some latent prints lifted from the crime scene. Sweedo also said that it was abnormal that the officers did not investigate the source of the bloody shoeprints.

Browning's attorneys then called Pike, Browning's trial counsel. Pike told the court that Marsha Gaylord would have testified to two crucial pieces of evidence that never came out at trial: (1) Gaylord and Browning had been in the Elsens' store prior to November 8, 1985, which could have explained the presence of Browning's fingerprints in the store; and (2) the Wolfes had a friend that was of Cuban descent. Pike could not call Gaylord as a witness, however, because she "disappeared" after the initial trial continuance. Pike asserted that he tried to locate Gaylord by using Martin Schopp, his investigator. Other than Browning himself, Gaylord was the only person who knew that Browning had been in the Elsens' store before November 8, 1985.

Pike then described his investigation of Browning's case. He explained that although he visited the Elsens' store after it was cleaned and reopened to the public, he never went when it was a crime scene. Pike explained that, to avoid becoming a witness himself, he had Schopp conduct all witness interviews. Pike did not have Schopp interview the Wolfes before trial, despite Pike's knowing that the Wolfes were "long time informants." Pike suggested that any inquiry into whether the Wolfes were receiving a benefit for their testimonies would have been futile because, in 1986, plea bargaining was "informal," and "basically, there were a lot of things that were done just with passive agreement." At some point prior to trial, Pike was told that the Wolfes had falsely accused a man named Jerold Morell of assaulting Vanessa

with a knife, but Pike could not recall making any attempt to locate Morell.

Pike did not retain a fingerprint expert because, as a former prosecutor, he "knew" all of the state's forensics witnesses and relied on informal conversations with them. Pike said that he could trust the state's main fingerprints expert to be "straight" with him.

Pike did not conduct any investigation into the source of the bloody shoeprints, and never authorized any interviews to determine when the responding officers observed the shoeprints. He explained that if he investigated the shoeprints' source and determined that they belonged to one of the paramedics, he would not be able to argue that the shoeprints exculpated Browning as the murderer. Pike characterized his overall trial strategy as "overcasting a shadow of doubt, as opposed to proving" Browning's innocence.

Before trial, Pike was told that a man named Thomas Stamps had information suggesting that Randy Wolfe and another man, Mike Hines, were attempting to sell some of the jewelry stolen from the Elsens' store. Pike could not recall why he did not have Schopp interview Stamps. Pike also could not recall why he did not instruct Schopp to interview Martha Haygard (the Wolfes' landlady), who had seen the Wolfes with a Cuban individual. Nor could Pike recall why he had not followed up on Coe's initial statement to the police that the man whom she saw running by her office was white, not black.

Investigator Martin Schopp also testified at the state habeas hearing. Schopp performed "substantially all the

investigative work" for Browning's defense. Schopp, however, did not have autonomy—Pike directed all of his inquiries. While the court appointed Schopp soon after Browning's arrest, Schopp was not contacted to perform any work until five months later, when Browning himself reached out. Schopp testified that such a significant delay was unusual and likely allowed evidence to get cold. Pike did not give Schopp a discovery file until August 1986—ten months after Browning's arrest—and the file included only police reports and a voluntary statement by Randy Wolfe. Pike gave Schopp no other information to create a foundation for his investigation. Schopp performed a total of 12 hours of investigative services for Pike—a number Schopp thought was low under the circumstances. Pike limited Schopp's investigation by denying Schopp's requests for additional investigation funds. Schopp and Pike spoke no more than five times, and each time only briefly.

Shopp explained that after preparing a preliminary report—which included a statement from Haygard that she saw the Wolfes wearing "big gold wedding bands" after the robbery—he felt that there were various other leads to follow. He requested that Pike permit him to interview the Wolfes and Thomas Stamps. He also wanted to interview Jerold Morell, who had told Pike that the Wolfes falsely accused him of sexually assaulting Vanessa with a knife. (A jury acquitted Morrell of those accusations.) Pike denied each of these investigation requests. Pike also never asked Schopp to interview any police officers or detectives. In Schopp's opinion, the investigation into Browning's case was never "completed."

Browning's state habeas counsel also called prosecutor Daniel Seaton. Seaton testified that after Browning was

convicted of the robbery-murder, Seaton gave Randy Wolfe two concrete benefits. First, he helped Randy get a drywalling job. Second, and more importantly, before Randy was sentenced on his conviction for attempted possession of stolen property, Seaton spoke to the sentencing judge on Randy's behalf. At Randy's sentencing hearing, the judge explained that Seaton had told him that Randy was "a witness in a recent trial," and in light of Randy's being "somewhat helpful" to the prosecution on "several occasions," Seaton felt Randy "deserve[d] something positive for doing that." The judge later noted that Seaton told him that Randy "more than fulfilled his obligation" in Browning's trial "and as a matter of fact put himself in some jeopardy and deserves something for it." In light of Seaton's statements to the sentencing judge, the prosecution in Randy's case withdrew its recommendation of five years imprisonment. The judge imposed only probation.

At the state habeas hearing, Seaton testified that he never promised Randy any benefits in exchange for his testimony against Browning, and decided to speak to Randy's sentencing judge only after Browning was convicted. Seaton admitted, however, that he had engaged in off-the-record plea bargaining in the past in at least one other case. Seaton also admitted that after he learned that the Wolfes kept some of the Elsens' stolen jewelry, Seaton did not impound the jewelry or instruct anyone else to do so. Nor did the state prosecute the Wolfes with any crime relating to the jewelry they kept.

Browning's state habeas counsel also called Officer Branon. Branon testified that he and another officer were the first to arrive at the crime scene—before paramedics or other officers entered the Elsens' store. Upon arrival, Branon

immediately noticed bloody shoeprints on the floor. Branon encountered Hugo Elsen lying in the corner of the store. Hugo was scared, but lucid. In Branon's original report, he wrote that the assailant had a Jheri Curl-type hairstyle. As noted above, Branon never explained at Browning's trial who gave him that description, and the speaker was not revealed. During the state habeas hearing, however, Branon explained that it was victim Hugo Elsen himself who had given the description. Branon also testified that Hugo did not use the term "Jheri Curl" when describing the assailant; rather, Hugo described the assailant's hair as shoulder length, loosely curled, and wet. It was Branon—who is black—who first used the term Jheri Curl to describe the assailant's hair. When shown pictures and a video of Browning from the night of November 8, 1985, Branon stated that Browning's hair was a "four inch Afro with braids on top of it," and could not be described as a Jheri Curl or shoulder length, loosely curled, and wet. The revealed testimony about the victim's description of the murderer's hair raised a critical identification issue.

Finally, Browning himself testified at his state habeas hearing. He told the court that on November 8, 1985, around 4:00 p.m., he was walking down the street when he saw Randy Wolfe driving a yellow Datsun. Browning asked Wolfe for a ride downtown, and as he approached, a Cuban man—whom Browning knew as Randy's friend—pushed Browning out of the way and entered the car. The Cuban man was wearing both the Hollywood hat and tan jacket found in the Wolfes' apartment when Browning was arrested. Randy told Browning to meet him back at the Wolfes' motel room, and then drove off.

# C

The state district court denied Browning's habeas petition on December 7, 2001, and filed its findings of fact and conclusions of law on October 24, 2002. Browning appealed to the Supreme Court of Nevada, which on June 10, 2004 affirmed the denial of Browning's challenge to his convictions, but reversed the district court's denial of Browning's challenge to his sentence. *Browning v. State*, 91 P.3d 39 (Nev. 2004). On remand, a jury again sentenced Browning to death. Browning appealed to the Supreme Court of Nevada, which affirmed. *Browning v. State*, 188 P.3d 60 (Nev. 2008). The United States Supreme Court denied a subsequent petition for a writ of certiorari. *Browning v. Nevada*, 556 U.S. 1134 (2009).

While he was being resentenced, Browning filed a petition for a writ of habeas corpus in the United States District Court for the District of Nevada. On November 28, 2011, Browning filed his Fifth Amended Petition, the operative version before our court now. After Browning abandoned several unexhausted claims, the district court denied Browning's petition in full on August 1, 2014. The district court granted Certificates of Appealability ("COA") on the following issues: (1) whether the prosecution's failure to produce evidence relating to the bloody shoeprints constituted a violation of Browning's rights as described in *Brady v. Maryland*, 373 U.S. 83 (1963), and/or *Napue v. Illinois*, 360 U.S. 264 (1959); (2) whether evidence impeaching Randy Wolfe's credibility was withheld in violation of Browning's rights under *Brady*; and (3) whether Pike was ineffective in light of his failure to investigate the source of the bloody shoeprints, Hugo Elsen's description of

the assailant, and the credibility of Browning's accusers. Browning timely appealed.[3]

## II

We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(a), and "review de novo the district court's dismissal of a habeas petition." *Runningeagle v. Ryan*, 825 F.3d 970, 978 (9th Cir. 2016). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), if a state court adjudicates a petitioner's federal law claim on the merits, a federal court may grant habeas relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[4]

---

[3] Browning has moved for expansion of the COA to include three additional issues. For the reasons set forth below, *see* Section IV.A, *infra*, we GRANT Browning's motion in part and expand the COA to include the issue of whether Browning's trial counsel was ineffective because of his overall failure to investigate Browning's case. Browning also seeks to expand the COA to include: (1) whether the trial court improperly instructed the jury on the element of deliberation, and (2) whether the prosecutor's statements during closing argument violated Browning's rights under the Due Process Clause. Because Browning has not "made a substantial showing of the denial of a constitutional right" for either issue, we DENY the motion in part as to those claims. 28 U.S.C. § 2253(c)(2).

[4] As the dissent notes, this deferential AEDPA standard is occasionally described as allowing habeas relief only when the state court's conclusions are so unreasonable that there is no "possibility of fair-minded disagreement." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015). The existence of cases post-dating AEDPA where the Supreme Court has granted habeas relief over dissent, however, suggest that this language is not to be construed as requiring unanimity, or as suggesting that jurists

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). "A state court's decision can involve an unreasonable application of Federal law if it either [(1)] correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or [(2)] extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Hernandez v. Small*, 282 F.3d 1132, 1142 (9th Cir. 2002) (internal quotation marks omitted).

Browning asks that we review some of his claims de novo rather than with deference to the Supreme Court of Nevada. He contends that the Supreme Court of Nevada's rulings were not on the merits, and that its reasoning was based on standards contrary to federal law. *See* 28 U.S.C. § 2254(d). Because we hold that Browning is entitled to relief based on an unreasonable application of United States Supreme Court precedent, we need not, and do not, address whether the Supreme Court of Nevada's decisions were on the merits or contrary to federal law.

## III

Under *Brady*, prosecutors are responsible for disclosing "evidence that is both favorable to the accused and material

---

who disagree with a grant of habeas relief are not fair-minded. *See, e.g.*, *Panetti v. Quarterman*, 551 U.S. 930 (2007) (a 5–4 decision holding that the state court unreasonably applied *Ford v Wainright*, 477 U.S. 399 (1986)) and *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) (a 5–4 decision holding that the state court unreasonably applied clearly established Supreme Court precedents requiring a sentencing jury in a capital case to be able to consider all mitigating evidence).

either to guilt or to punishment." *United States v. Bagley*, 473 U.S. 667, 674 (1985) (internal quotation marks omitted). The failure to turn over such evidence violates due process. *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (per curiam). The prosecutor's duty to disclose material evidence favorable to the defense "is applicable even though there has been no request by the accused, and . . . encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citation omitted).

Under *Napue*, convictions obtained through the use of false testimony also violate due process. 360 U.S. at 269. A violation occurs whether the prosecutor solicits false statements or merely allows false testimony to go uncorrected. *Id.* The constitutional prohibition applies even when the testimony is relevant only to a witness's credibility, *id.*, and where the testimony misrepresents the truth, *see Miller v. Pate*, 386 U.S. 1, 6 (1967) (prosecutor "deliberately misrepresented the truth" by presenting testimony that shorts with large reddish-brown stains tested positive for blood, while leaving out that the stains were made by paint).

For claims under *Brady*, the prosecutor's personal knowledge does not define the limits of constitutional liability. *Brady* imposes a duty on prosecutors to learn of material exculpatory and impeachment evidence in the possession of state agents, such as police officers. *See Youngblood v. West Virginia*, 547 U.S. 867, 869–70 (2006) ("*Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995))).

In the Ninth Circuit, the same is true for claims under *Napue*. First, in *Giglio v. United States*, the Supreme Court held that it would impute to an entire prosecution office one prosecutor's knowledge that a government witness's testimony was false, even though the prosecutor with knowledge of the false testimony was not the trial attorney on the case. 405 U.S. 150, 154 (1972). Then, in *Jackson v. Brown*, we applied the same principle to police officers with knowledge that trial testimony offered by the government was false, holding that "*Napue* and *Giglio* make perfectly clear that the constitutional prohibition on the 'knowing' use of perjured testimony applies when any of the State's representatives would know the testimony was false." 513 F.3d 1057, 1075 (9th Cir. 2008).

However, the dispositive question on the *Napue* claim here is what "clearly established Federal law, as determined by the Supreme Court of the United States," says on the issue. *See* 28 U.S.C. § 2254(d)(1). We recently answered that question. Despite our holding in *Jackson*, we held in *Reis-Campos v. Biter* that "it is not clearly established that a police officer's knowledge of false testimony may be attributed to the prosecution under *Napue*." 832 F.3d 968, 977 (9th Cir. 2016).

As the habeas petition in *Jackson* was filed before AEDPA's effective date, *Jackson* did not directly address whether there was clearly established Supreme Court precedent as required by 28 U.S.C. § 2254(d)(1). As such, *Reis-Campos*—a case decided under the AEDPA standard—is controlling on that question. *See* 832 F.3d at 973.

The district court granted a COA as to whether the prosecution violated (1) *Brady* or *Napue* with respect to

Officer Branon's undisclosed observation of the bloody shoeprints, and (2) *Brady* with respect to evidence of an undisclosed benefit for Randy Wolfe's testimony. We expand the COA to include a third claim: whether the prosecutor violated *Brady* by not disclosing the actual description that Hugo Elsen gave to Officer Branon of the assailant's hair.[5] We first address whether each piece of evidence was exculpatory, triggering a potential duty to disclose under *Brady*, and for the shoeprint evidence, whether it involved the prosecution's knowing presentation of misleading testimony in violation of *Napue*. We then turn to materiality.

## A

*The bloody shoeprints.* At trial, Browning argued that the bloody shoeprints—which did not match the shoes Browning was wearing when he was arrested—demonstrated that

---

[5] We expand the COA to cover this claim because we conclude that reasonable jurists could disagree with the district court's ruling that not disclosing Hugo's precise description of the hair did not violate *Brady*. *See Buck v. Davis*, 137 S. Ct. 759, 773 (2017). As we explain in this opinion, the prosecution's failure to disclose that evidence was in violation of *Brady*.

The state argues that we lack jurisdiction to expand the COA in this manner because Browning did not explicitly include the hair description issue in the section of his brief labeled "uncertified issues." We disagree. When the content of a brief covers an uncertified issue, "we may treat it as a request to expand the scope of the certificate of appealability." *Robertson v. Pichon*, 849 F.3d 1173, 1187 (9th Cir. 2017) (quoting *Delgadillo v. Woodford*, 527 F.3d 919, 930 (9th Cir. 2008)). Though Browning did not style his hair-description arguments as a request to expand the COA, he nonetheless thoroughly discussed the issue. We construe that discussion as a request to further expand the COA.

someone else committed the murder. The prosecution responded with Officer Horn's testimony that responding paramedics and off-duty detectives often wear tennis shoes at crime scenes, misleadingly suggesting that the shoeprints came from them. But during the state habeas hearing, Branon testified that he and Officer Robertson were the first responders at the store, before the paramedics or other officers, and that the shoeprints were there when he arrived. Branon's observation of the shoeprints was directly contrary to Horn's suggestion that paramedics or other officers left the prints. Had Branon's observation been disclosed, Browning could have used that evidence to bolster his contention that the shoeprints were left by the real killer. This makes Branon's observation exculpatory under *Brady*. *See Kyles*, 514 U.S. at 441 (undisclosed witness observation did not match defendant, and so was exculpatory). And, under *Brady*, Branon's knowledge of the shoeprints is imputed to the government as a whole. *See Youngblood*, 547 U.S. at 869–70.

Browning contends that the prosecution's handling of the shoeprint evidence similarly implicates *Napue*. He asserts that Branon's observation, which was written in Branon's original report, made Horn's testimony that paramedics or off-duty detectives often wear tennis shoes misleading, because it suggested a source of the shoeprints that could not have been true. *See Miller*, 386 U.S. at 6–7. But there is no evidence suggesting that the prosecution knew that Horn misrepresented the truth. And, as we held in *Reis-Campos*, it is not clearly established under Supreme Court precedent (and was not clearly established under Supreme Court precedent on June 10, 2004, the date of the Supreme Court of Nevada's decision rejecting Browning's *Napue* claim) that the prosecution had a duty to learn from Branon about his

observation. *See* 832 F.3d at 977. Browning contends that the evidence suggests Horn knew that his testimony was misleading. But this theory runs into the same obstacle: it is not, and was not on June 10, 2004, clearly established that Horn's knowledge would be imputed to the prosecution. The record before the Supreme Court of Nevada does not suggest that the prosecution knew that Horn's testimony was false or misleading. As a result, Browning has not shown that the Supreme Court of Nevada unreasonably applied clearly established Supreme Court precedent in denying his *Napue* claim.

*Benefit for Randy Wolfe's Testimony.* When Pike learned that Randy had been allowed to plead guilty in an unrelated case to a lesser charge of attempted possession of stolen property, Pike moved for a continuance in Browning's case to investigate whether Randy and Seaton had made a deal. Seaton responded in court: "I can tell the court categorically . . . there has never been any plea bargaining with Randy Wolfe regarding this case." At Browning's trial, Randy similarly testified that he had not been promised anything for his testimony, including any promise of a more lenient sentence on his recent conviction. But after Browning's trial, Seaton spoke with Randy's sentencing judge on Randy's behalf. This led Randy's prosecutor to withdraw his recommendation of five years, and the judge to sentence Randy to only probation. The Supreme Court of Nevada held that this constituted withholding of impeachment evidence favorable to Browning at his trial,[6] Browning, 91 P.3d at 54–55, and the state does not dispute that conclusion.

---

[6] The Supreme Court of Nevada held that while impeachment evidence was withheld, that information was not material. *Browning*, 91 P.3d at 55.

While the Supreme Court of Nevada explicitly concluded that Seaton improperly withheld evidence in this context, it never specified precisely what evidence the prosecution should have disclosed.  It stated:

> [T]he prosecutor withheld information regarding benefits given to an important witness for the State, Randy Wolfe. . . . [A]t th[e] time [of trial], Wolfe was the defendant in a separate criminal prosecution, and the prosecutor admitted at the post-conviction evidentiary hearing that after Browning's trial he told the district judge assigned to Wolfe's case that Wolfe had helped in prosecuting Browning . . . .   Though the prosecutor maintained that he acted unilaterally and never made any deal with Wolfe, this information still should have been disclosed to the defense.  Under *Brady*, even if the State and a witness have not made an explicit agreement, the State is required to disclose to the defense any evidence implying an agreement or an understanding.

*Id.* (citing *Jimenez v. State*, 918 P.2d 687, 694–95 (Nev. 1996)).  The only way this information could be "evidence implying an agreement or an understanding" would be if Randy *knew* that Seaton was contemplating speaking to Randy's sentencing judge.  If Randy did not know, then Seaton's intentions would have had no impact on Randy's motivations to tell the truth, or not, at trial.  We therefore read the Supreme Court of Nevada's decision as concluding that Randy knew that Seaton might help reduce his sentence if he

testified against Browning.[7]    It is that piece of evidence—Randy's expectation of a potential benefit in exchange for his testimony—that constituted impeachment evidence that should have been disclosed to Pike. *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 300 (1991) (recognizing that benefits conferred by authorities may motivate a witness to lie).

*Hugo Elsen's Description of the Killer's Hair*. Browning's hairstyle at the time of the robbery was an Afro. At trial, Officer Branon testified that he received a description of the suspect at the scene as sporting a "shoulder length J[h]eri-type curl." At closing, the prosecution argued that whoever gave this description to Branon did not know

---

[7] The dissent reasons that this determination by the Supreme Court of Nevada was "not based on any facts in the record," and that the Supreme Court of Nevada therefore "engaged in an unreasonable determination of the facts" in violation of 28 U.S.C. § 2254(d)(2). But at no point in this case has the state challenged the Supreme Court of Nevada's ruling on that point. We also do not see how it could. The federal habeas statutes provide a mechanism by which state prisoners can challenge on federal grounds the authority behind their detention by state officers. They do not provide a means for federal courts to engage in error correction of state court rulings that favor defendants. The statutory language makes this plain: 28 U.S.C. § 2254(d)(2) states that "[a]n application for a writ of habeas corpus . . . shall not be granted with respect to any claim . . . unless the adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Also, 28 U.S.C. § 2254(e)(1) states "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." These statutory principles are limitations on federal courts' power to grant habeas relief. We do not understand how the dissent wrings from these provisions an affirmative power to rule that a state court erred in doing too little to justify its detention of a petitioner.

the difference between a Jheri Curl and an Afro. But during the state habeas hearing, Branon testified that the description he was given did not actually include the words "Jheri Curl." Rather, Hugo told him that the assailant's hair was "shoulder length," "loosely curled," and "wet." Branon, who is African American, then interpreted those words to mean a Jheri Curl, and used that term in his original report.

Neither "Jheri Curl" nor "shoulder length," "loosely curled," and "wet" are descriptions of an Afro. But only "Jheri Curl" is susceptible to the argument that the speaker could have seen an Afro and used the wrong term because he was unfamiliar with African American hairstyles. Had the prosecution disclosed before trial that victim Hugo Elsen's description of his assailant's hair was not a "shoulder length J[h]eri-type curl," but "shoulder length," "loosely curled," and "wet," Browning could have easily refuted the prosecution's argument. This makes the exact words Hugo used to describe his assailant evidence favorable to the defense under *Brady*.[8]

---

[8] The dissent calls this a "novel view" of *Brady*. According to the dissent, our analysis "extends the state's obligations into the murky zone of *interpretations* of otherwise neutral facts." But facts do not exist in a vacuum. Their exculpatory value invariably depends on the interpretations offered, and the theories pressed, by the parties. Consider, for example, one of the pieces of *Brady* material in *Kyles*. 514 U.S. 419. The prosecution in that case did not disclose to the defense a list of the cars parked in the parking lot where the victim was killed, a list which did not include the defendant's car. *Id.* at 450. The Supreme Court held that the list was exculpatory in part because the prosecution "argued to the jury[] that the killer drove to the lot and left his car there." *Id.* Had the prosecution instead argued that the killer walked to the scene of the crime, the list of cars would have had less exculpatory value to the defense. Likewise here, the prosecution's argument that the speaker did not know the difference between a Jheri Curl and an Afro affected the exculpatory

We hold that Officer Branon's shoeprint observation, Randy's understanding that Seaton was considering speaking with Randy's sentencing judge in exchange for Randy's testimony against Browning, and the precise hair description Branon received from Hugo Elsen were all favorable to Browning under *Brady*. We also hold that Browning's *Napue* claim fails because it was not clearly established at the time of the Supreme Court of Nevada's decision that a police officer's knowledge of false or misleading testimony would be imputed to the prosecution.

For the *Brady* evidence, except for Randy's expectation of a benefit for his testimony, the Supreme Court of Nevada did not explicitly address whether this evidence was favorable to Browning. But in light of our above analysis, we hold that had the Supreme Court of Nevada not viewed the evidence as favorable to the defense, it would have been an unreasonable application of Supreme Court precedent.

**B**

We turn now to materiality as an element of the *Brady* claims. Under *Brady*, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. When there are multiple *Brady* claims, the Supreme Court instructs that we consider materiality "collectively." *Kyles*, 514 U.S. at 436. We must imagine that every piece of suppressed evidence had been disclosed, and

---

value of Hugo's precise words. We offer a straightforward application of clearly established *Brady* principles, not a "novel interpretation."

then ask whether, assuming those disclosures, there is a reasonable probability that the jury would have reached a different result. *See, e.g.*, *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017); *Cone v. Bell*, 556 U.S. 449, 473–74 (2009).

Applying this procedure to the facts before us, and incorporating AEDPA deference, we address the following question: Imagine that the prosecution had disclosed (1) that Officer Branon observed that the shoeprints existed before paramedics or other officers arrived; (2) that Randy expected a benefit for his testimony; and (3) that Hugo Elsen described the assailant as having shoulder length, loosely curled, and wet hair, rather than a Jheri Curl. Was it objectively unreasonable for the Supreme Court of Nevada to conclude that there was not a reasonable probability that the jury would have reached a different result?

We conclude that the answer is yes. Officer Branon's undisclosed shoeprint observation disproves the prosecution's primary rebuttal against Browning's strongest piece of evidence that someone else killed Hugo. The undisclosed evidence of a benefit for Randy's testimony adds a powerful reason to disbelieve him and his wife, the prosecution's most critical witnesses. And the undisclosed evidence of Hugo's exact dying words defeats the prosecution's central argument against its probativeness.

Also, the prosecution's trial evidence was remarkably weak. Its case relied on flawed identifications and the Wolfes' unreliable testimony. And the physical evidence was just as consistent with Browning having been framed as with him being the killer.

We conclude that it was an objectively unreasonable application of Supreme Court precedent to hold that the *Brady* materiality standard was not met here. Below, we discuss materiality in more detail, analyzing the relevant evidence at trial piece-by-piece, with an aim to showing the probable ultimate effect on the jury's decision.

*The Bloody Shoeprints.* Browning's trial theory was that someone else killed Hugo Elsen. The shoeprints leading from Hugo to the front door lent strong support to this theory. But Officer Horn's testimony suggesting that paramedics or other officers could have left the shoeprints gave the jury a reason to disregard strong evidence raising questions of reasonable doubt. Had the prosecution disclosed Branon's observation about the shoeprints, the source of several bloody shoeprints would remain a mystery. This means the jury would have been left with powerful evidence that Browning was not the killer.

In its briefing, the state responds that Officer Branon's observation was not so helpful for Browning's defense because the shoeprints could have been made by Josy Elsen or Debra Coe. But that is pure speculation. The prosecution had the opportunity to offer at trial evidence that Josy or Coe made the shoeprints, but either chose not to do so or did not have such evidence. We cannot now assume such evidence exists. *See Miller-El v. Cockrell*, 537 U.S. 322, 345 (2003) ("Had there been evidence obtainable to contradict and disprove the testimony offered by petitioner, it cannot be assumed that the State would have refrained from introducing it." (internal quotation marks omitted)). In any event, as the district court noted, it is unlikely that either Josy or Coe was the source of the prints because there is no evidence that either of them went anywhere near the store's front door after

Hugo was stabbed.  There are also photos in the trial record
of the shoeprints next to a ruler.  Examining the photos as if
we were the jury viewing them as exhibits at trial, the
shoeprints appear to us larger than those of a typical woman's
shoe.[9]

At oral argument, counsel for the state
proffered a different theory.  He asserted that there
were in fact two sets of prints: one set around
Hugo Elsen's body, and another leading from the body
to the front door.  *See* Oral Arg., *Browning v. Baker*,
No. 15-99002 (Mar. 16, 2017) at 23:00–23:47,
https://www.youtube.com/watch?v=8va4fhOsWZ8. Counsel
argued that the shoeprints Officer Branon referred to in his
testimony were only those immediately surrounding Hugo's
body, which Josy or Coe may have created while giving aid
to Hugo.  *Id.* at 23:50–24:20.  According to his theory, the
other prints—which led from the body to the front
door—were left later by paramedics.  *Id.* at 24:22–24:55. But
the state did not raise this argument in its briefing before this
court (or apparently in any court); it has thus long been

---

[9] In the state habeas proceeding, Browning argued the same point but
with expert testimony.  He submitted a report from forensics examiner
Michael Sweedo that stated that the shoeprints were too big to have been
made by the typical woman's tennis shoe.  This evidence was not part of
the original trial record, and we are doubtful that we may consider it in
determining materiality under *Brady*.  Nevertheless, we need not decide
the issue because the *Brady* violations here were material without
considering post-trial revelations.

forfeited. *See Harger v. Dep't of Labor*, 569 F.3d 898, 904 n.9 (9th Cir. 2009); Fed. R. App. P. 28(b).[10]

A final possibility, one the parties do not discuss but that the jury might have considered, was that Browning made the shoeprints, but then changed his shoes before being arrested. But like the theory that Josy or Coe left the prints, there is no evidence to support this possibility. The prosecution never found any such shoes in the Wolfes' or Browning's apartments, nor any other shoe that matched the prints.

The bloody shoeprints were strong evidence that Browning was not the killer. Had the prosecution disclosed Branon's observation, that strong evidence would have gone unrebutted.

*Benefit for Randy Wolfe's Testimony*. Randy and Vanessa Wolfe were the prosecution's most important witnesses. They were the original accusers, the source of the alleged murder knife, and the source of Browning's alleged confession. It is fair to say that had the jury not credited the Wolfes' testimony, Browning would not have been convicted.

---

[10] Moreover, the record does not support this new theory. Counsel seemed to derive the theory from the particular words chosen by Officers Branon and Horn in describing the location of the shoeprints. At the state habeas hearing, Branon testified that the shoeprints were "near" Hugo, while Michael Sweedo, reading from Horn's police report, stated that the prints led from Hugo's body to the front door. We are unpersuaded. A description of shoeprints "near" a body could easily mean shoeprints leading from that body to another part of the room. The state also presents no other evidence, such as different tread patterns in the shoeprints, to support the two-sets theory. And we have already explained why the evidence does not support Josy or Coe having left any of the shoeprints.

The jury had plenty of reasons not to believe the Wolfes. The Wolfes admitted that they used heroin and cocaine,[11] that Vanessa was a prostitute, and that Randy stole property. Randy had prior convictions, including a recent conviction for which he would soon be sentenced. Randy admitted to keeping some of the stolen jewelry and lying about it at Browning's preliminary hearing. Vanessa testified that she used to "bilk people out of their money."

Given this mountain of evidence providing potential reasons to doubt the Wolfes' credibility, getting just one juror to change his or her mind about the truth of the Wolfes' testimony likely would not have required much. *See Agurs*, 427 U.S. at 113 ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.").

Evidence suggesting that Randy was expecting leniency in his sentencing in exchange for his testimony against Browning could have accomplished this task. And, it could have done so without being merely cumulative of the impeachment evidence already in the record. Evidence that Randy was expecting a benefit for his testimony would have revealed that the Wolfes had a "direct, personal stake in [Browning]'s conviction." *Id*. at 683. The other impeachment evidence concerning the Wolfes' criminal activity and penchant for lying suggested to the jury that the Wolfes were untrustworthy. But evidence suggesting that Randy had a personal stake in Browning's conviction would

---

[11] The Wolfes' use of drugs is relevant to their credibility because it indicates that in the past they engaged in illegal activity. However, that the Wolfes were physically addicted to drugs is not here relevant to their credibility. *See United States v. Kizer*, 569 F.2d 504, 506 (9th Cir. 1978).

have shown the jury why the Wolfes would lie in this particular case. *See Maxwell v. Roe*, 628 F.3d 486, 510 (9th Cir. 2010) ("The undisclosed benefits that the informant received added significantly to the benefits that were disclosed and certainly would have cast a shadow on the informant's credibility.  Thus, their suppression was material." (internal quotation marks and alterations omitted)). Such evidence would have been uniquely impeaching, and if disclosed, may have broken the camel's back and persuaded the jury to disbelieve the Wolfes.  Without the Wolfes, the prosecution had no case.[12]

*Hugo Elsen's Description of the Assailant's Hair*.  Had the prosecution disclosed the precise words Hugo used to describe his assailant's hair, the prosecution's argument that the source of the description must not have known the difference between a Jheri Curl and an Afro would have failed, leaving the jury with no reason to disregard Hugo's description.  Hugo's precise description—wet, shoulder length, and loosely curled—significantly undermines the case against Browning.  The description was markedly different from Browning's hair on the day of the murder—an Afro—and, according to Branon, Hugo was lucid when he gave it.  Moreover, it was unlikely that Hugo was mistaken about his description in light of Branon's "meticulous"

---

[12] The dissent contends that, when engaging in this analysis, "our role is not to reweigh the evidence and make fresh credibility determinations." We disagree that this argument is controlling.  To determine whether the jury would have been swayed by additional evidence, we must put ourselves in the shoes of the jurors and ask whether the same result would be reached if presented with this new, hypothetical trial record.  There is no way to do that without making fresh credibility determinations, particularly when the new evidence is impeachment evidence, and is therefore relevant only because of its tendency to affect credibility.

questioning. Hugo also had the closest and most accurate view of the assailant's hair, while, as discussed below, every other eyewitness identification was seriously flawed. Hugo's vivid description of a hairstyle so different from Browning's presented substantial reason to doubt that Browning was the one who stabbed Hugo. If the jury no longer had reason to reject that description, and the jury knew that the description came from the victim, it would have raised grave doubt about the prosecution's theory of the case.

*Identifications*. The identifications presented at trial were significantly flawed. Two of the three original positive identifications were equivocal at best, and the officers' presentation procedures were textbook examples of suggestive techniques. *See United States v. Wade*, 388 U.S. 218, 228 (1967) ("A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification.").

Josy Elsen saw only the side of the assailant's head after waking from a nap. She told officers it was unlikely that she would be able to identify the assailant because she saw him only for a moment, and never saw his face. During the photo lineup, Josy pointed to three photos of men that were not Browning, saying only that their hair resembled the assailant's. While Josy identified Browning at trial, it was only after seeing Browning at more than a dozen preliminary

hearings, and at each he was presented as the accused. Josy's identification deserves, at most, minimal weight.[13]

Coe's identification was not much better. An officer presented Coe with Browning—who was shirtless and handcuffed—and said, "We think we have a suspect. Is this him?" At this point, Browning's appearance, the officer's question, and the form of the showup rendered the procedures highly suggestive and any resulting identification of little evidentiary value. *See Stovall v. Denno*, 388 U.S. 293, 302 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."), *abrogated on other grounds by Griffith v. Kentucky*, 479 U.S. 314 (1987). Coe then said that she only "thought" Browning was whom she had seen running by her office. This was despite initially telling police that the man she saw was white and did not look as if he came from the Elsens' store. Coe also told police that "when [she] see[s] a black person, [] they all look the same," giving less reason for confidence in her already uncertain identification. Coe said at trial that after having had "time to think about it," she was sure that it was Browning that she saw. But her in-court identification says far less than her equivocal contemporaneous one. *Cf. Gilbert v. California*, 388 U.S.

---

[13] Browning argues that Josy never positively identified Browning at trial, and that the state conceded as much during state habeas proceeding. However, Browning has not provided the Court with any documentation regarding the state's supposed concession. The prosecution did significantly overstate Josy's identification, saying that she pointed at Browning and said, "That's the man who was kneeling over my husband," when in fact Josy had merely said that Browning was in the courtroom. The identification was not, as Prosecutor Seaton maintained, "as good as you can ask for." Nevertheless, we agree with the trial court that Josy identified Browning at trial.

263, 272 (1967) (tying admissibility of in-court identification in part to the constitutionality of a pretrial identification).

Woods gave a positive identification of Browning at the scene. But police used the same suggestive procedure they did with Coe. They told Woods that they had a suspect and then presented Browning wearing only pants, and not as part of a multi-person lineup. Again, these procedures cast doubt on the answer they produced.[14]

Not counting the far-after-the-fact and suggestive in-court identifications, the only unequivocal identification of Browning at the time of the crime was Woods's, in response to a suggestive, one-person showup. But even crediting Woods's identification, it tells us almost nothing about who killed Hugo Elsen. Woods stated that he saw Browning jogging towards him (and away from the Elsens' store), getting within touching distance. *Browning was not carrying anything and had no blood on him.* We do not understand how Woods's identification and description of Browning—no blood on him and nothing in his hands—would support an inference that Browning had just brutally stabbed a man to death and stolen 70 pieces of jewelry. The only thing that Woods's identification, if credited, proves is that Browning

---

[14] Hoffman was subject to the same suggestive procedure as well, but curiously, no party at trial squarely asked him whether Browning was the same man he had seen earlier walking towards the Elsens' store. Nevertheless, Hoffman's trial testimony hints at what his answer would have been. He testified that the man he saw was wearing a hat, and that Browning did not appear as though he had recently been wearing a hat. Hoffman also told police that the man he saw was "Cuban," supporting Browning's defense theory that the Wolfes and their Cuban friend framed him for the murder.

was a few blocks from his residence around 4:30 p.m. on November 8, 1985.

*The Jewelry*.   When police arrested Browning in the Wolfes' apartment, they found many pieces of the stolen jewelry in the same room as Browning.  However, the rest of the jewelry was turned over later by the Wolfes (except for the items Randy kept for himself).  There was no evidence at trial that Browning's fingerprints were on any of the stolen jewelry.  The jewelry evidence is just as consistent with the Wolfes framing Browning for the murder as it is with Browning being guilty.

*Browning's Appearance When Arrested*.   The Elsens, Coe, Hoffman, and Woods gave somewhat similar descriptions of the clothes on the man they saw.  Josy and Hugo Elsen both described a man wearing a blue cap.  Coe described a blue cap, Levi's, and a dark blue jacket.  Woods described dark pants, a light-colored shirt, and a "darker color" hat—a "beret sort of thing."  Hoffman described Levi's, a shirt that he vaguely recalled as plaid, and a blue baseball cap.  When police arrested Browning, he was not wearing any jacket, any shirt, or any hat.  The shoes Browning was wearing did not match the bloody shoeprints at the crime scene, and there was no evidence that Browning had any blood on him.  Police recovered a blue hat in the dumpster outside the Normandy Motel, but again, this discovery was just as consistent with the Wolfes being responsible for the murder as Browning.

*Fingerprints*.   Officer Horn lifted "twenty some odd" fingerprints from the scene, two of which matched Browning's prints.  One of Browning's prints was from the top glass of one of the disturbed counters, and the other was

from a fragment of the counter's broken sliding-glass door. However, the store was only two blocks from Browning's residence, and there was no evidence as to how long the prints had been present. *See Mikes v. Borg*, 947 F.2d 353, 361 (9th Cir. 1991) ("[I]n a case resting upon the premise that the defendant impressed his fingerprints on an object at the time of the commission of the crime and supported solely by evidence that the defendant's fingerprints were found on that object, the record must contain sufficient evidence . . . that the defendant touched the object *during the commission of the crime*."). Browning could have visited the store at some earlier point. Or he could have been involved in the robbery, while someone else—say Randy Wolfe or the Wolfes' Cuban friend—committed the murder. *Cf. Wearry*, 136 S. Ct. at 1006 ("[T]he evidence the dissent cites suggests, at most, that someone in Wearry's group of friends may have committed the crime, and that Wearry may have been involved in events related to the murder *after* it occurred.").

Steven Scarborough, who examined the fingerprints, also testified that he compared the approximately twenty fingerprints lifted from the scene against only Browning's and Hugo Elsen's. This left no evidence about whether any of the prints matched Randy or Vanessa Wolfe, or any other possible suspect. Moreover, the prosecution did not present any evidence that the fingerprints were bloody or that blood was on the glass. Had Browning stabbed Hugo and then broken the case and stolen the jewelry as the prosecution suggested, the fingerprints likely would have had blood on them.

The fingerprint evidence is probably the strongest evidence against Browning. But it is by no means decisive, and we conclude that it is not enough to avoid the otherwise

substantial reasonable doubt created by the shoeprint evidence, the evidence that Randy expected a benefit for his testimony, and Hugo's description of the assailant's hair.[15]

*Blood-Spotted Jacket.*  Vanessa Wolfe identified a tan windbreaker found in her apartment as belonging to Browning.  Criminalist Minoru Aoki testified that blood found on the jacket was type B, the same blood type as Hugo Elsen's.  The prosecution argued at trial that the jacket proved that Browning was the killer.  But Aoki's testimony only showed that the blood on the jacket was the same type as Hugo Elsen's (out of four types), not that there was a DNA match.[16]  The jacket did not match any of the descriptions given by the identification witnesses, who all said the jacket they saw was blue.  And even if the killer had worn the jacket, there was no reason to believe that Browning was wearing the jacket on November 8, 1985.  The jacket was found in the Wolfes' apartment, tying it just as easily to Randy or his Cuban friend as to Browning.  The jacket was a zero-sum for the prosecution's case.

---

[15] In the state habeas proceeding, Browning presented expert testimony that it was possible that the print on top of the glass case could have come from someone leaning over the case, and that the print found on the shard of glass on the floor behind the counter could be consistent with someone pushing the glass door open.  Defense counsel Pike also testified at the habeas hearing that he had planned to call Browning's girlfriend, Marsha Gaylord, to testify that she had been in the jewelry store with Browning prior to the day of the crime, but that Pike was unable to do so because Gaylord had disappeared.  As already discussed, we grant relief without deciding whether such post-trial evidence bears on materiality under *Brady*.

[16] In the state habeas proceeding, the parties stipulated that post-trial DNA testing revealed that the blood on the jacket conclusively did not belong to Hugo Elsen.  Again, we do not rely on this post-trial evidence.

*The Knife*. Vanessa Wolfe testified that she saw Browning shaking water off of a knife in her apartment, and that he asked her to help get rid of it. But there was no blood or fingerprints found on the knife, and apart from Vanessa's testimony, no other evidence tying the knife to the murder. Dr. Giles Green testified that Hugo's wounds could have been made by the knife, but nothing made him think that that particular knife was the murder weapon.[17] Even if there had been some physical evidence connecting the knife to the murder, there was still no such evidence that Browning had even touched it. Indeed, the knife, like the tan jacket, is just as consistent with the Wolfes or a friend of theirs committing the murder as with Browning being the killer. Outside of Vanessa's testimony, the knife adds nothing to the prosecution's case.

In sum, the jewelry, the knife, and the tan jacket all failed to tie Browning to the murder. The identifications were flawed and mostly equivocal. There were endless reasons to distrust the Wolfes. When arrested, Browning was not wearing any clothing described by the eyewitnesses, and there was no evidence that Browning had any blood on him. All the prosecution had left was the fingerprints. But even with those, there was no evidence about how long the prints had been present, and no evidence that the other prints from the scene did not match either of the Wolfes or their Cuban friend. The upshot is that the prosecution presented a fundamentally weak case. Add Officer Branon's observation of the shoeprints, thus leaving unanswered significant

---

[17] In the state habeas proceeding, Browning introduced a forensics report indicating that Hugo Elsen's wounds "do not coherently coincide" with the knife found in the Wolfe's apartment. We do not rely on this evidence.

evidence that someone besides Browning, Josy, Coe, a paramedic, or a police officer was in the store with Hugo while he was bleeding; add evidence that the prosecution was planning to help its best witness in an unrelated sentencing, suggesting a motive for the witness and his wife to lie at trial; add an unrebutted closeup description from the victim that did not match the defendant; and that fundamentally weak case collapses under the weight of its reasonable doubt. "Even if the jury—armed with all of this new evidence—*could* have voted to convict [Browning], we have no confidence that it *would* have done so." *Wearry*, 136 S. Ct. at 1007 (internal quotation marks omitted). And yet Browning sits on death row. We conclude that there is a reasonable probability that had the concealed evidence not been withheld, the jury would have reached a different result.

We also hold that this result is the only objectively reasonable conclusion. Whatever confidence the Supreme Court of Nevada found in Browning's verdict, it was not a confidence that was objectively reasonable. The strength of the undisclosed evidence is too great, and the remainder of the trial record too weak. "'[F]airness' cannot be stretched to the point of calling this a fair trial." *Kyles*, 514 U.S. at 454. The district court should have granted habeas relief on Browning's *Brady* claims.

## IV

Browning also asserts that he was denied his right to effective assistance of trial counsel. To show a violation of that right, Browning must demonstrate that (1) Pike's performance was deficient, and (2) that deficiency prejudiced Browning. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because AEDPA guides our review, we ask whether

the Supreme Court of Nevada "applied *Strickland* to the facts of [t]his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002). We conclude that it did.

## A

We first clarify the scope of Browning's IAC claim on appeal. In its order, the district court limited the COA to particular "claims" that Pike's failure to investigate particular avenues of evidence were deficient. The district court granted COAs on whether Pike's failure to investigate (1) the source of the bloody shoeprint, (2) the Wolfes' credibility as witnesses, and/or (3) Hugo Elsen's actual description of the assailant to Officer Branon each constituted individual instances of ineffective assistance of counsel. Limiting the COA in this manner was error.

Browning is entitled to a COA if he "has made a substantial showing of the denial of a *constitutional right*." 28 U.S.C. § 2253(c)(2) (emphasis added). Browning's habeas petition asserts that he was denied the constitutional right of effective trial counsel. This right is a guarantee of effective counsel *in toto*—it promises that counsel will perform reasonably. While an individual claiming IAC "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," *Strickland*, 466 U.S. at 690, the court considers counsel's conduct *as a whole* to determine whether it was constitutionally adequate, *see, e.g.*, *id*; *Wong v. Belmontes*, 558 U.S. 15, 17 (2009) ("In light of the variety of circumstances faced by defense counsel and the range of legitimate decisions regarding how best to represent a criminal defendant, the performance inquiry necessarily turns on whether counsel's assistance was reasonable considering

all the circumstances." (internal quotation marks and alterations omitted)). The district court distorted this inquiry by separating Browning's IAC argument into individual "claims" of IAC corresponding to particular instances of Pike's conduct. This approach was misguided. Rather, the IAC portion of the COA should have been crafted at a higher level of generality.

Browning asks us to expand the COA to include whether he "was denied effective assistance of counsel by his trial lawyer's wholesale failure to investigate and prepare for trial." Because this articulation more appropriately frames the constitutional right Browning's petition contends was violated, and because—as explained below—he "has made a substantial showing of the denial" of that right, 28 U.S.C. § 2253(c)(2), we GRANT his motion to expand the COA to include that issue.

## B

The first element of an IAC claim requires Browning to show that his counsel's performance was "deficient," or more precisely, "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Browning may not rely on generalities in making this showing; he must point us to specific instances of Pike's conduct that demonstrate incompetent performance. *Id.* at 690. Because Browning asserts that Pike failed to adequately investigate the case, Browning must show that Pike violated his "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. The ABA Standards for Criminal Justice in effect during Browning's trial, to which the Supreme Court has "long . . . referred as guides to determining what is reasonable,"

*Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (internal quotation marks omitted), help clarify Pike's investigatory obligations. They included "the duty . . . to conduct a prompt investigation of the circumstances of the case . . . includ[ing] efforts to secure information in the possession of the prosecution and law enforcement authorities." ABA Standards for Criminal Justice, Standard 4-4.1 (2d ed. 1980); *see also Summerlin v. Schriro*, 427 F.3d 623, 629–30 (9th Cir. 2005) (en banc) ("The standards in effect at the time of Summerlin's trial [which occurred prior to Browning's] clearly described the criminal defense lawyer's duty to investigate . . .").

We examine Pike's performance in a "highly deferential" manner, "indulg[ing] a strong presumption that [Pike's] conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Moreover, because we are operating under AEDPA deference, our review is "doubly deferential[,] . . . tak[ing] a highly deferential look at counsel's performance, through the deferential lens of § 2254(d)." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (citation and internal quotation marks omitted). Browning therefore must show more than "a strong case for relief"—he must demonstrate that "there is no possibility fairminded jurists could disagree that the state courts decision conflicts with" Supreme Court precedent. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). We conclude Browning has made this showing.

Browning first points us to Pike's failure to interview Officer Branon prior to calling Branon to testify at trial. The Supreme Court of Nevada concluded that this was deficient performance, *Browning*, 91 P.3d at 46, and we agree. We have previously assumed without deciding that "it ordinarily

falls below the *Strickland* level of required competence to put a witness on the stand without interviewing him." *Jackson v. Calderon*, 211 F.3d 1148, 1160 (9th Cir. 2000). Because the government does not challenge the Supreme Court of Nevada's conclusion on this point, we need not decide whether failing to interview a witness before calling him to the stand invariably constitutes objectively unreasonable representation, and do not disturb the Supreme Court of Nevada's conclusion that it did in this case.

Browning also argues that Pike's failure to investigate the source of the bloody shoeprints constituted deficient performance. At the state habeas hearing, Pike explained this decision by noting that if he attempted to determine the source of the shoeprints and discovered that the source was paramedics or responding officers, he would disprove his own theory that the prints were left by the assailant (who was someone other than Browning). In other words, Pike apparently chose not to investigate the source of the shoeprints because he thought Browning was guilty, and thus assumed the shoeprints had been left by paramedics and other responders. The Supreme Court of Nevada held that this was a reasonable tactic, explaining, "[a]s long as the source of the prints was unknown, counsel could argue to the jury that the actual murderer had left them." *Browning*, 91 P.3d at 46.

On this issue, the Supreme Court of Nevada unreasonably applied *Strickland*'s deficiency standard by blindly accepting Pike's strategy. "Counsel cannot justify a failure to investigate simply by invoking strategy. . . . Under *Strickland*, counsel's investigation must determine strategy, not the other way around." *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017). Pike's invocation of strategy here is an extreme instance of strategy determining investigation. If a defense

attorney's "fear of learning the truth" rendered every decision not to investigate a reasonable tactic, even the most egregious failures to investigate a client's case would be protected from constitutional scrutiny.  Even worse, under the Supreme Court of Nevada's reasoning, a criminal defendant's entitlement to a reasonable investigation would depend on his attorney's uninformed, gut-based intuition about his client's guilt.  In other words, according to the Supreme Court of Nevada, if your criminal attorney does not believe your story, your attorney need not investigate your case.  The Sixth Amendment required more in 1986, and still does today.

To be sure, a decision not to investigate particular facts may be reasonable *when the attorney has reason to believe* doing so would reveal inculpatory evidence.  In *Richter*, for example, the defendant argued that his attorney should have had a blood expert test a pool of blood from the crime scene to determine whether it was a mixture of two victims' blood. 562 U.S. at 108.  Such a result would have dramatically bolstered the defense's theory.  *See id.*  But the test could have also *disproved* the defense's theory by only detecting a single blood source.  *See id.*  The Court explained that the defendant's attorney decided not to test the blood because he "had reason to question the truth of his client's account" in light of the client's prior false statements.  *Id*.  Because of the "serious risk" that the test would expose the defense's theory "as an invention," defense counsel's decision was reasonable. *Id.*

Here, the facts are the opposite.  Pike had no reason to disbelieve Browning's assertions that he had been framed by the Wolfes.  And more importantly, contrary to Pike's fears, there was little risk that investigation into the source of the shoeprints could damage Browning's defense theory.  Had

Pike interviewed Branon before calling him to the stand, Pike could have asked him whether paramedics or police officers had entered the store before Branon's arrival. If Branon's answer was "no," this would have bolstered Browning's theory. But even if Branon had responded "yes," Pike could have decided *then* to inquire no further, and still would have inflicted no harm on his theory. Pike thus had no reason to fear that any inquiry into the source of the shoeprint would damage his case. While "[a]n attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense," *id.* at 108, the reverse is also true: the obligation to investigate, recognized by *Strickland*, exists when there is no reason to believe doing so would be fruitless or harmful.[18]

Browning also asserts that Pike's performance was deficient because Pike never interviewed the Wolfes before trial. When asked about this at the state habeas hearing, Pike explained that he had a policy of never personally interviewing witnesses to prevent becoming a witness himself. Rather, he had Martin Schopp conduct all interviews. The Supreme Court of Nevada concluded that this was a reasonable strategy. *Browning*, 91 P.3d at 46.

There can be no doubt that Pike's policy of not personally interviewing witnesses was reasonable. But that policy in no way explains why Pike rejected Schopp's request to interview

---

[18] Browning offers a different but related argument: the Supreme Court of Nevada's conclusion that Pike's performance was deficient due to his failure to interview Branon *at all* requires a holding that Pike was deficient for not asking Branon about the shoeprints. Because there was a deficiency in not interviewing Branon at all, we need not decide if any particular questions were needed to be asked.

the Wolfes. Merely articulating a reasonable strategy in response to a deficiency argument does not end the inquiry when that strategy does not explain the decision itself. *See* Wayne R. Lafave, et al., *Criminal Procedure* § 11.10(c), at 797 (6th ed. 2016) ("Of course, a decision apparently based on a tactical judgment is not therefore rendered immune from an incompetency challenge."). Pike gave *no explanation* for why Schopp could not conduct the interview himself. Yet the Supreme Court of Nevada concluded that Pike's no-personal-interviews strategy explained his decision to not subject the Wolfes to interviews. That conclusion makes no sense and is objectively unreasonable.

Finally, in arguing for an expansion of the COA, Browning lists a number of other alleged deficiencies in Pike's representation.[19] Because we find that Browning's ineffective assistance of counsel claim succeeds on other grounds, we do not here assess these other alleged deficiencies.

Our IAC analysis is based on the fundamental obligations of each attorney, and is not a product of hindsight. *See Bell*, 535 U.S. at 702. Pike had "countless ways" to investigate

---

[19] These include: Pike's not offering evidence at trial that Browning had no blood, cuts, or scrapes on his body when he was arrested; failing to secure Gaylord's testimony; not challenging the prosecution's assertion that when they entered the Wolfes' apartment Browning was "surrounded" by jewelry; not objecting to the prosecutor's improper closing statements; not bringing out at trial that Browning had no heroin in his body when he was arrested; not objecting to Seaton's claim that the tan jacket had Hugo Elsen's blood on it; not presenting evidence demonstrating that Gaylord was not in jail on November 8, 1985; never obtaining a forensic evaluation of the knife; and never getting a witness to testify that Randy Wolfe tried to sell the jewelry.

adequately Browning's case. We do not limit him to just "one technique or approach." *Richter*, 562 U.S. at 106. And to be sure, Pike's "poking holes" and "casting shadows" strategy could have been appropriate under the right circumstances. *See id.* at 109 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates."). But to reach the conclusion that this strategy was reasonable, Pike first had an obligation "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Here, Pike did neither. His failure to investigate what happened on November 8, 1985, "so undermined the proper functioning of the adversarial process that [Browning's] trial cannot be relied on as having produced a just result." *Id.* at 686.

We conclude that Pike unreasonably failed to investigate Browning's case, and that the Supreme Court of Nevada unreasonably concluded that Browning failed to prove just that.

## C

We now consider whether the unprofessional deficiencies identified above prejudiced Browning. Despite its differing terminology, prejudice in the IAC context mirrors the materiality standard under *Brady*. We ask whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694; *see Gentry v. Sinclair*, 705 F.3d 884, 906 (9th Cir. 2013) ("*Brady* materiality and *Strickland* prejudice are the same."). To meet

this standard, Browning must demonstrate a reasonable probability that had Pike conducted an adequate investigation, "at least one juror would have harbored reasonable doubt about" Browning's guilt. *Buck v. Davis*, 137 S. Ct. 759, 776 (2017). Because we defer to the Supreme Court of Nevada's decision under AEDPA, our ultimate inquiry is whether that court's conclusion that any deficient performance by Pike did not prejudice Browning was objectively unreasonable. We conclude that it was.

We have already explained in detail why the prosecution's case against Browning was quite weak. In fact, because the standards of materiality for *Brady* and *Strickland* are the same, our materiality analysis above is in large part identical to the assessment of the prejudicial effect of Pike's ineffective assistance. But while we will not repeat that analysis here, we cannot just incorporate the materiality section above in its entirety. The evidence to consider in the IAC context differs in one important aspect: even if Schopp had interviewed the Wolfes, there is no reason to believe that Randy would have made any mention of his expectation that he would receive leniency in exchange for his testimony against Browning. After all, Randy stated explicitly at Browning's trial that he was not anticipating any such benefit. We therefore consider, for purposes of assessing prejudice in the context of Browning's IAC claim, the following facts that would have been available to Browning had Pike engaged in an adequate investigation: (1) that the shoeprints could not have been created by a paramedic or responding officer, and (2) that Hugo Elsen described his assailant not as having a Jheri Curl, but as having shoulder-length, wet, loosely-curled hair. As discussed above, this evidence would have had a significant impact on Browning's case. The bloody shoeprints were the only evidence left in the store during the

period between the robbery and the arrival of the first-responders, and the evidence does not support that the shoeprints were left by Josy Elsen or Debra Coe . This leaves Browning with evidence that someone else—not Browning, not Josy, not Coe—was in the store with Hugo Elsen before the arrival of the first-responders. Such evidence would have been significantly and uniquely exculpatory. *Cf. Richter*, 562 U.S. at 112 (rejecting petitioner's prejudice claim because it "established nothing more than a theoretical possibility" that petitioner's defense theory was true); *Pinholster*, 563 U.S. at 200–01 (rejecting petitioner's prejudice claim because the evidence at issue was duplicative of other evidence presented to the jury).

And Hugo's description of his assailant's hair is powerful evidence of Browning's innocence. As stated above, Hugo's view and description of the assailant suffers from none of the flaws inherent in each of the other eyewitness accounts involved in this case. Officer Branon said it was not possible that Hugo was mistaken about his description of the assailant. And Woods's description of Browning running towards him on the sidewalk away from the Elsens' store—with not a drop of blood on him or a piece of jewelry in his hands—is, if anything, supportive of Browning's innocence.

As described in great detail above, the prosecution's evidence was far from overwhelming. There is a strong possibility that had Pike offered the evidence he would have obtained if he had made a reasonable investigation, at least one juror would have harbored reasonable doubt. Browning would have so substantially benefited from that evidence that it was objectively unreasonable for the Supreme Court of Nevada to conclude to the contrary.

## V

Our conclusions above regarding Browning's claims under *Brady* and *Strickland* involve only his convictions relating to the robbery and murder of Hugo Elsen. They do not affect the validity of his escape conviction. It is not clear from Browning's habeas petition whether he challenges his escape conviction. But even assuming he means to challenge that conviction, he has identified no exculpatory evidence withheld that would have affected the jury's decision to convict him of escape under Nev. Rev. Stat. § 212.090. And while Pike's investigation into Browning's case was deficient, Browning points to no evidence that Pike would have obtained had he reasonably investigated the case that would have affected the jury's decision on the escape count. In sum, while Browning has demonstrated that he is entitled to habeas relief from his murder- and robbery-related convictions, he is not entitled to relief from his escape conviction.

## VI

The Supreme Court of Nevada's denial of Browning's claims under *Brady* and *Strickland* constituted an unreasonable application of clearly established Supreme Court precedent. Browning is entitled to a writ of habeas corpus with respect to his convictions of burglary, robbery with the use of a deadly weapon, and murder with the use of a deadly weapon. Because Browning has offered no reason to call the validity of his escape conviction into question, he is not entitled to habeas relief as to that conviction.

We **AFFIRM in part, REVERSE in part, and REMAND** to the district court for further proceedings consistent with this decision.

CALLAHAN, Circuit Judge, dissenting in part:

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "circumscribe[s]" a federal court's role in reviewing a habeas claim that was "adjudicated on the merits in State court proceedings." *Johnson v. Williams*, 568 U.S. 289, 298 (2013) (quoting 28 U.S.C. § 2254(d)); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). The Supreme Court has made clear, time and again, that our task is limited to deciding whether the state court was "objectively unreasonable" in its application of federal law, as determined by the United States Supreme Court, or in its determination of the facts that were before the trial court. *See Lockyear v. Andrade*, 538 U.S. 63, 75 (2003); *see also Johnson*, 133 S. Ct. at 1094.

Today's majority gives short shrift to the Supreme Court's admonitions. Along the way, it misapplies Supreme Court case law, embarks on its own fact-finding mission, and overrules the jury's credibility determinations. A meaningful application of our deferential standard of review under AEDPA, by contrast, compels the conclusion that the Nevada Supreme Court was not objectively unreasonable in rejecting Browning's Ineffective Assistance of Counsel ("IAC") claim, as well as his claims under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959). I

respectfully dissent and would deny Browning's habeas petition.[1]

## I. Background

Sometime between 4:00 p.m. and 4:30 p.m. on November 8, 1985, Hugo Elsen was stabbed to death inside his jewelry store. In the course of the murder, the assailant smashed a glass display case and stole some 72 pieces of jewelry.

The police immediately identified Browning as a suspect based on eyewitness accounts and circumstantial evidence. Three individuals identified Browning at or near the jewelry store around the time of the murder. Hugo's wife, Josy, actually witnessed the murder. She saw a "black man with a blue cap" raise a knife over Hugo. While she got only a side view of the attacker, she noted that his hair "was a little bit puffed out on the bottom" of his cap. That description was consistent with Browning's Afro-like hairstyle. Police later recovered a blue cap with the word "Hollywood" on it in a dumpster near Browning's motel room. At trial, Josy identified that cap as the one worn by the killer. Presented with a photographic lineup approximately a month after the murder, which included a photo of Browning, Josy did not choose Browning's photo. However, when confronted with Browning in person at trial, Josy gave a positive identification of Browning as the assailant.

After Josy witnessed the murder, she ran out the back of the shop to the business next door and asked someone to call the police. Debra Coe was in the neighboring office, located

---

[1] I concur in the majority's rejection of Browning's *Napue* claim and in its affirmance of his escape conviction.

just south of the Elsens' store. When Josy told her that "there was a man standing over Hugo with a knife," Coe went to the front of her office and saw a black man running "south." Coe identified the man as wearing a blue cap, a jacket, and Levi's, with hair sticking out about an inch from underneath the cap. At trial, Coe identified the blue "Hollywood" cap—presented as a state trial exhibit—as the one worn by the person she saw run by her office.

Later the same day, the police presented Coe with two men. She stated that the first man was "definitely not" the person she saw. The police then presented Browning, who was wearing no cap, shirt, or jacket. Coe said she "thought" Browning was the person she saw run by her office, but that she would have been more certain had he been wearing the cap and jacket. She noted, however, that his hair was "pressed down" as though he had been wearing a cap. When asked if she could be "more sure in [her] mind," Coe said "[n]o, I wouldn't think so, no . . . . they all look the same and that's just what I think when I see a black person, that they all look the same." Coe retracted this statement at trial, testifying that she did not really think that all black people looked the same. At trial, Coe positively identified Browning as the man she saw run by her office.

Charles Woods owned a jewelry store three doors south of the Elsens' shop. At around 4:30 p.m., he was standing outside the front of his store when he saw a black man jogging toward him. The man was wearing a dark-colored, "beret"-style cap, a light-colored shirt, and dark pants. Later that day, the police presented Woods with Browning, as they did with Coe, and Woods positively identified Browning as the man he saw. He also positively identified Browning at trial, though, unlike Josy and Coe, he testified that the hat

found near Browning was not the same one worn by Browning.

Bradley Hoffman owned a store two doors from the Elsens'. At trial, he testified that he saw a man walk by his shop and approach the Elsens' store about 20 minutes before the robbery-murder. He described the man as a Cuban, with a slight build, wearing Levi's jeans and a blue baseball cap. Like Coe and Woods, Hoffman was presented with Browning by the police later that day. He stated that Browning was not the man he saw. He also testified that the blue "Hollywood" cap recovered by the police, and positively identified by Josy and Coe, was not the cap worn by the man he saw.

Hugo also identified his assailant. Officer David Radcliffe was one of the first officers on the scene. He found Hugo lying in a pool of blood and in an "extremely serious" condition. Hugo identified his attacker as "a black man wearing a blue baseball cap." Officer Gregory Branon also arrived early on the scene, and he, too, received a description of the attacker from Hugo. Hugo stated that the suspect was a "black male" who was "wearing a blue baseball cap, blue windbreaker-type jacket, blue Levi's" and who had "shoulder length" hair. At trial, Branon testified that the description he received[2] included a description of the attacker's hair as a "J[h]eri-type curl."

Besides the eyewitness identifications, two witnesses—Randy Wolfe and his wife, Vanessa—testified that Browning confessed to them to committing the crime. At the time, the Wolfes, as well as Browning and his girlfriend,

---

[2] Branon did not identify Hugo as the source of the description until post-conviction proceedings some 15 years later.

Marcia Gaylord, resided at the Normandy Motel. The two couples were acquainted. According to Randy, shortly after the robbery-murder, Randy found Browning in the Wolfes' room, wearing a blue "Hollywood" cap and surrounded by some of the stolen jewelry. Browning admitted to Randy to stealing the jewelry and killing Hugo. Randy then left to get the police, at which point Vanessa entered the room. According to Vanessa, she found Browning with a knife, and saw the "Hollywood" cap on the floor. Like Josy and Coe, Vanessa identified the state's trial exhibit as the cap she saw near Browning.

According to Vanessa, Browning asked her to help him dispose of the evidence. Vanessa threw his shirt and cap in a dumpster and hid the knife in a small closet under the stairway of the motel. The police later recovered the items. At trial, expert testimony established that the knife was "consistent" with Hugo's wounds. Browning was arrested in the Wolfes' motel room approximately half an hour after the murder. Several pieces of the stolen jewelry were in the room with him, as well as a tan jacket.

The prosecution also presented physical evidence. The tan jacket had blood on it, which was later identified as Type B—Hugo's blood type. Browning's fingerprints were also found at the crime scene. Identification Specialist David Horn testified at trial that several of the showcase counters had been "disturbed," and that a glass door on the vendor's side of one of the counters was broken. Browning's prints were found on top of one of the counters and also on a fragment from the vendor-side glass door, which is the employee area.

Several pieces of exculpatory evidence were presented at trial. Horn testified to finding bloody shoeprints leading from Hugo's body to the front door of the Elsens' store. Those prints were consistent with a tennis shoe and did not match the shoes Browning was wearing at the time of his arrest. Browning's trial counsel, Randall Pike, also called a hairstyle expert to testify to the difference between a Jheri curl and an Afro. Branon had testified that the description he received was of a person with "shoulder-length," "J[h]eri curl" hair, whereas Browning had an Afro-style haircut. Pike presented the hairstylist with the same photographic lineup that the police showed Josy. She stated that four of the photos depicted individuals with Jheri curls—none of them was Browning.

Finally, the jury was presented with substantial evidence relevant to the Wolfes' credibility. The jury knew that the Wolfes were habitual heroin and cocaine users, that Vanessa was a prostitute, that Randy had several prior convictions, that Randy was awaiting sentencing in another case, that Vanessa used to "bilk people out of their money," that Randy had kept some of the stolen jewelry, and that Randy had lied under oath about doing so at a preliminary hearing.

Ultimately, the exculpatory evidence was not enough to create reasonable doubt in any of the jurors' minds. A Nevada jury found Browning guilty of four counts related to a robbery and murder at a Las Vegas jewelry store and sentenced him to death. *See Browning v. State*, 757 P.2d 351 (Nev. 1988).

## II. Procedural History

In 2004, the Nevada Supreme Court affirmed Browning's conviction in a state habeas proceeding. *Browning v. State*, 91 P.3d 39 (Nev. 2004). Browning argued, as is relevant to the instant appeal, that the prosecution withheld *Brady* material—i.e., exculpatory evidence—and that his trial counsel, Randall Pike, provided ineffective assistance for failing to adequately investigate his case. *See id.* at 45, 54.

As is relevant here, Browning identified three pieces of allegedly exculpatory evidence in the state court post-conviction proceedings. First, he argued that the prosecution should have disclosed Officer Branon's observation that the bloody shoeprints at the crime scene predated the arrival of police and other first responders. *Id.* at 55. Second, he argued that the prosecution should have disclosed that the term "Jheri curl" came from a black police officer (Branon), rather than the white victim. *Id.* Third, he claimed that the prosecution withheld information regarding a benefit given to Randy Wolfe.[3] *Id*. at 54–55.

Browning also argued that Pike was ineffective for, among other things, failing to interview Branon. *Id.* at 46. Browning reasoned that had Pike done so, he would have

---

[3] Pretrial, the prosecution stipulated that Randy was not promised anything for his testimony, a point that Randy confirmed on the stand. *See Browning*, 91 P.3d at 55; Trial Tr. at 4 (Dec. 8, 1986). During post-conviction proceedings, Prosecutor Seaton admitted that after Browning's trial, he told the judge in a case in which Randy was the defendant that Randy had helped with Browning's trial. *Id.* Randy ended up receiving probation for attempted possession of stolen property—a conviction that could have resulted in a 5-year sentence. Seaton also helped Randy secure a job. *Id.*

discovered that the bloody shoeprints could not have been left by first responders, and that Hugo's description of his attacker's hair did not include the term "Jheri curl." *Id.* Moreover, Browning argued that Pike should have interviewed the Wolfes, as they were the prosecution's key witnesses. *Id.*

The Nevada Supreme Court upheld Browning's guilty verdict.**[4]** As to Browning's IAC claim, the court ruled that it was a reasonable trial strategy to not interview Branon to discover his knowledge of the bloody shoeprints. *Id.* at 46. Pike's investigation was sufficient to determine that the prints did not match Browning. *Id.* The court held that it was a "reasonable, tactical decision to leave the source of the prints uncertain." *Id.* That way, Pike could argue that the real killer was the source. *Id.* Had he investigated further, he may have discovered that first responders were responsible for the prints, thereby neutralizing this defense. *Id.*

As for Pike's failure to interview the Wolfes, the court held that it was a reasonable tactic for Pike to delegate witness interviews to his investigator, lest he interview witnesses personally and risk becoming a percipient witness himself. *Id.* Moreover, Pike's investigator had "gathered enough information to permit [Pike] to adequately cross-examine the Wolfes on their version of events, their drug usage, their informer status, their lying, and their convictions and arrests." *Id.*

---

**[4]** The Nevada Supreme Court reversed the district court's denial of Browning's challenge to his sentence of death, *Browning*, 91 P.3d at 56, but the jury subsequently reinstated the death sentence on remand and the Nevada Supreme Court affirmed in *Browning v. State*, 188 P.3d 60 (Nev. 2008).

Finally, while the court concluded that Pike was deficient for not discovering that "Jheri curl" was Branon's term and not Hugo's, it held that this was not prejudicial because the "issue of Browning's hairstyle was extensively explored at trial." *Id.*

As to Browning's *Brady* claims, the Nevada Supreme Court held that the prosecution should have disclosed the benefit to Randy Wolfe. *Id.* at 54–55. The court reasoned that, "[u]nder *Brady*, even if the State and a witness have not made an explicit agreement, the State is required to disclose to the defense any evidence implying agreement or an understanding." *Id.* at 55. Even so, the court ruled that there was no "reasonable probability of a different result" had the information been disclosed because Randy's "credibility was extensively challenged at trial." *Id.* The court also rejected Browning's bloody shoeprint *Brady* claim, noting that it had already deemed that information to be immaterial in the IAC context, and that the information was available to the defense had Pike interviewed Branon. *Id.* The court similarly rejected Browning's *Brady* claim regarding the hairstyle evidence, noting that this information was, like the shoeprint evidence, available to the defense. *Id.*

Finally, the Nevada Supreme Court considered whether any errors, considered cumulatively, were prejudicial. *Id.* at 56. As is relevant here, the court considered Pike's failure to discover Hugo's true description of the killer's hair, and the prosecution's failure to turn over impeachment evidence regarding Randy Wolfe. *Id.* It determined that there was no "reasonable probability" that Browning would not have been convicted but for the cumulative effect of the errors. *Id.* The court reasoned that the "evidence of Browning's guilt remains overwhelming." *Id.*

Browning filed a petition for a writ of habeas corpus in the United States District Court for the District of Nevada. On November 28, 2011, Browning filed his Fifth Amended Petition, which is the petition before us. On August 1, 2014, the district court denied Browning's petition. The district court granted Certificates of Appealability ("COA") on the issues of (i) whether the prosecution committed a *Brady* or *Napue* violation by failing to turn over information regarding the bloody shoeprints, (ii) whether the prosecution committed a *Brady* violation by failing to turn over evidence of a benefit to Randy Wolfe, and (iii) whether Pike provided ineffective assistance by failing to investigate the source of the bloody shoeprints, Hugo's description of his attacker's hair, and the Wolfes' credibility. Browning appealed.

### III. Standard of Review

We review the district court's decision de novo, while applying AEDPA's "highly deferential standards" to the last reasoned state court decision—here, the Nevada Supreme Court's 2004 denial of post-conviction relief. *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015); *see Reis-Campos v. Biter*, 832 F.3d 968, 973 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 1447 (2017). The state court's decision receives binding deference unless it is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time of the state court's decision, or if it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2); *Wiggins*, 539 U.S. at 520.

Surmounting AEDPA deference is "daunting." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). This is by

design out of respect for state court proceedings, and is "satisfied in relatively few cases." *Id.*; *see also Williams*, 133 S. Ct. at 1094. "[AEDPA] reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)). It is not enough that a federal court determine, in its "independent judgment," that the "state-court decision applied clearly established federal law erroneously or incorrectly . . . . Rather, that application must be *objectively unreasonable.*" *Lockyear*, 538 U.S. at, 75–76 (emphasis added and internal citation omitted). Where "it is possible to read the state court's decision in a way that comports with clearly established federal law . . . we must do so." *Mann v. Ryan*, 828 F.3d 1143, 1157–58 (9th Cir. 2016). In other words, we must uphold a state court determination even if we would have concluded, on de novo review, that the state court committed legal error, so long as a fair-minded jurist could decide otherwise. *See Lockyear*, 538 U.S. at 75–76. To overrule a state court's decision requires that its ultimate conclusion be so unreasonable that it there is *no* "possibility for fairminded disagreement." *Ayala*, 135 S. Ct. at 2199 (internal quotation marks omitted). Finally, a federal court may not review the facts of a case de novo; we must begin with the "presumption" that the state court's factual determinations are correct. *Taylor*, 366 F.3d at 999.

## IV. Browning's Claims for Relief

Browning's petition comes down to three pieces of evidence: the description of the assailant provided by the victim, Hugo Elsen; bloody shoeprints leading from Hugo's

body; and the benefit received by Randy Wolfe for his testimony. None of this evidence compels a finding that the Nevada Supreme Court was objectively unreasonable in rejecting Browning's petition for post-conviction relief.

First, Hugo's description of the killer was presented to the jury, and the jury knew that the description conflicted with other eyewitness testimony. That the jury did not know the term "Jheri curl" was the testifying officer's and not the victim's did not appreciably diminish this conflict. Second, Pike's ignorance of the fact that the bloody shoeprints predated the arrival of first responders did not undercut his defense that someone other than Browning committed the murder because he *did* know that the prints did not match Browning. And third, the jury was presented with a cavalcade of impeachment evidence against Randy and Vanessa Wolfe. That the jury did not know that the prosecution would *later* help Randy secure a benefit for his testimony against Browning—a fact that apparently Randy did not even know—makes no difference because it was not reasonably probative of his credibility. And even if it was, the information was, at most, cumulative.

The weakness of the alleged exculpatory evidence is enough to reject Browning's habeas petition on its own. But it positively blanches when set against the substantial evidence inculpating Browning: his fingerprints were found on the vendor's side of a glass display case, which is off-limits to customers; he was found by police with some of the stolen jewelry; numerous eyewitnesses identified him; and he confessed to the Wolfes.

**a. Browning Fails to Establish a *Brady* Violation Because the Purported *Brady* Evidence Is Either Not Exculpatory or Not Material**

The Nevada Supreme Court decided Browning's *Brady* claim on the merits. We therefore apply AEDPA's deferential standard of review, and may only find a *Brady* violation if the state court's decision was an objectively unreasonable application of Supreme Court law or an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2).

Under *Brady v. Maryland*, the prosecution must disclose "evidence that is both favorable to the accused and material either to guilt or to punishment." *United States v. Bagley*, 473 U.S. 667, 674 (1985) (internal quotation marks omitted). "'Evidence is material within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)). "'A reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

> Thus, to establish a *Brady* violation, a defendant must prove: 1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching, 2) the evidence was suppressed . . . either willfully or inadvertently, and 3) prejudice resulted, meaning there is a reasonable

probability that disclosing the evidence to the
defense would have changed the result.

*Andrews v. Davis*, 798 F.3d 759, 793 (9th Cir. 2015) (internal
quotation marks and adjustments omitted) (citing *Strickler v.
Greene*, 527 U.S. 263, 281–82 (1999); *Bagley*, 473 U.S. at
682).

The Nevada Supreme Court reasonably concluded that no
*Brady* violation occurred because the hairstyle and
impeachment evidence is not exculpatory, and, while the
shoeprint evidence is exculpatory, a fair-minded jurist could
deem it immaterial when viewed collectively with the
abundant evidence of Browning's guilt.

### i. Whether the Purported *Brady* Material Is Exculpatory

### 1. The Hairstyle Evidence

The jury did not know that Officer Branon received a
description of the assailant from the victim himself. Instead,
Branon recounted the description that Hugo gave him,
without identifying its source. He told the jury that

> [t]he description we received was black male,
> adult in his late twenties, wearing a blue
> baseball cap, blue windbreaker-type jacket,
> blue Levi's. He was medium complexioned,
> bore a mustache and what was described as a
> shoulder length J[h]eri-type curl.

This was a mostly accurate reporting of Hugo's dying
declaration, except that the term "J[h]eri-type curl" was

Branon's, not Hugo's. Browning argues that the prosecution's failure to turn over the fact that Branon's description came from the victim himself, and that the term "J[h]eri-type curl" was Branon's, not Hugo's, was materially exculpatory.

The Nevada Supreme Court held that no *Brady* violation occurred because the exculpatory information was "reasonably available to the defense." *Browning*, 91 P.3d at 55. And, at any rate, the information did not give rise to a "reasonable probability of a different result." *Browning*, 91 P.3d at 46. This was because the "issue of Browning's hairstyle was extensively explored at trial." *Id.*

The Nevada Supreme Court's conclusion was not objectively unreasonable because a fair-minded jurist could conclude that the hairstyle evidence was not exculpatory, let alone materially so. *See Ayala*, 124 S. Ct. at 2199. The majority concludes otherwise only by asserting a novel view of *Brady* that extends the state's obligations into the murky zone of *interpretations* of otherwise neutral facts. That "Jheri curl" was Branon's term and not Hugo's does not help Browning. The only basis for deeming this information potentially exculpatory is that Prosecutor Daniel Seaton leveraged its purported source—Hugo, a white male—to argue that the speaker probably confused the terms Afro and Jheri curl. Seaton reasoned that the declarant was just "some white person" who didn't "really know[] the true definition of J[h]eri-curl." But while it is true that the source of the term was a black male, the *evidence* itself is not exculpatory, and the jury was free to disregard Seaton's unsubstantiated speculation as just that.

## 2. The Benefit to Randy Wolfe for His Testimony

It is undisputed that the prosecution intervened on Randy Wolfe's behalf in a separate trial in which Randy was the defendant *after* Randy testified in Browning's trial. Yet the Nevada Supreme Court determined that the prosecution should have disclosed the benefit to the defense. *Browning*, 91 P.3d at 54–55. The court reasoned that "the State is required to disclose to the defense any evidence implying an agreement or an understanding." *Id.*

It appears that the Nevada Supreme Court's determination was not based on any facts in the record. Both Randy and Prosecutor Seaton stated that there was no plea bargaining with Randy Wolfe regarding Browning's case, and Browning points to nothing in the record showing that Randy expected a benefit for his testimony. The Nevada Supreme Court therefore erred in concluding that the evidence was exculpatory. *See Amado v. Gonzalez*, 758 F.3d 1119, 1136 (9th Cir. 2014) (quoting 28 U.S.C. § 2254(d)(2)) (state court made an "unreasonable determination of the facts" where "[t]here was nothing in the record that could support" its finding).

The majority correctly notes that the evidence could only be exculpatory if Randy actually expected a benefit for his testimony that was not already disclosed. But the Nevada Supreme Court never made such a finding. Under AEDPA, we are not entitled to weave facts out of whole cloth just to make sense of a state court's determination. *See id.* Because nothing in the record shows that any deal was made—expressly or otherwise—between Seaton and Randy

at the time of trial, nothing was suppressed and no *Brady* violation occurred.[5]

### 3. The Bloody Shoeprint Evidence

The jury knew that the bloody shoeprints leading from Hugo's body to the front of the Elsens' store did not match the loafers Browning wore at the time of his arrest. But post-conviction testimony also established that Branon knew that the shoeprints were present before first responders arrived at the scene. Under *Brady*, that knowledge is imputed to the prosecution as a whole. *Kyles*, 514 U.S. at 437–38 (the "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). Yet Specialist Horn testified that the prints were consistent with tennis shoes, and noted that first responders often wear tennis shoes at crime scenes. The jury was therefore left with the impression that first responders may have left the shoeprints. That was false. Moreover, the prosecution offered no evidence to suggest that someone besides the true killer could have been the source of

---

[5] The majority goes to great lengths in an attempt to shore up the Nevada Supreme Court's determination. Besides imputing to that court a finding that it did not make, the majority argues that it doesn't matter anyway because federal courts are powerless to review a state court's findings that favor the habeas petitioner. But the federal habeas statutes are only a one-way ratchet with respect to *who* may seek federal court review. *See* 28 U.S.C. § 2254(a). While only a prisoner may invoke a federal court's jurisdiction to challenge his detention, nothing in the habeas statutes prevents a federal court from reviewing the *entire* record—including facts that the state court construed as favorable to the petitioner—once it has properly asserted jurisdiction. The majority cites no authority for the proposition that a state court's factual (or legal) errors are impervious to challenge in such a situation.

the prints. Evidence that the shoeprints were present before the first responders arrived was therefore exculpatory.

### ii. Whether the Purported *Brady* Evidence is Material

The majority correctly notes that the three *Brady* claims must be considered "collectively" to determine whether they are material. *Kyles*, 514 U.S. at 436; *Turner*, 137 S. Ct. at 1895 (considering the "cumulative effect of the withheld evidence"). Materiality is a determination of whether disclosure of all pieces of exculpatory evidence, taken together, gives rise to a "reasonable probability" of a different outcome. *See Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

The majority concludes that the cumulative effect of three pieces of evidence—Hugo's description of his killer's hairstyle, the source of the bloody shoeprints, and the benefit for Randy Wolfe's testimony—tips the scales in favor of a finding of materiality.[6] The majority's conclusion is not compelled either by the evidence or binding Supreme Court law.

---

[6] Tellingly, the majority arrives at this conclusion only after *sua sponte* expanding the certificate of appealability to include an alleged *Brady* violation not even raised by Browning on appeal: Hugo's description of his assailant's hairstyle. Considering our obligation to consider *Brady* evidence cumulatively to determine its prejudicial effect, it is unclear whether the majority could have found a *Brady* violation if the certificate was limited to the two claims that Browning actually raised before this court.

**1.** The majority errs by assuming that the benefit to Randy Wolfe and the hairstyle evidence is *Brady* material. As discussed (*see* Part IV.a.1, 2), both pieces of evidence are reasonably viewed as not exculpatory and so withholding the information has no material impact on the case. But even if the hairstyle evidence could be deemed exculpatory because its disclosure would have foreclosed Seaton's argument that "some white person" confused the terms "Jheri curl" and "Afro," it was not unreasonable for the Nevada Supreme Court to deem it immaterial. The majority concedes that all of the words Branon used to describe Browning's hair are inconsistent with an Afro—"Jheri curl," "shoulder length," "loosely curled," and "wet." In other words, Branon's use of the term "Jheri curl" did nothing to diminish the conflict in the eyewitness testimony that was squarely before the jury.[7] On the one hand, Hugo described Browning as having wet, shoulder-length hair. On the other, Josy and Coe described the person they saw as having short hair that "puffed" or stuck out the back of a blue cap. That the jury was also exposed to the term "Jheri curl" does not somehow reconcile these inconsistent accounts.

The term "Jheri curl" also lost its salience over the course of the trial. Browning's counsel presented a hairstyle expert, Annie Yates, who testified to the difference between a Jheri curl and an Afro. Pike then showed her a 12-person photographic array and asked her to identify which persons

---

[7] The majority suggests otherwise, asserting that the "precise words Hugo used to describe his assailant's hair" is material under *Brady* because Hugo's description of his assailant as having shoulder-length hair "was markedly different from Browning's hair on the day of the murder—an Afro." But the defense *did* know that Hugo's description included the term "shoulder-length hair," and that information *was* presented to the jury.

had Jheri curls. The array included a picture of Browning. Yates stated that four of the persons had Jheri curls, none of whom was Browning. The jury therefore knew that Browning's Afro hairstyle was inconsistent with a Jheri curl. Accordingly, it was not objectively unreasonable for the Nevada Supreme Court to reject the hairstyle *Brady* claim because the hairstyle evidence was not materially exculpatory.

Undeterred, the majority insists that the information was critical to the defense because, it reasons, "Jheri curl" is the only term "susceptible to the argument that the speaker could have seen an Afro and used the wrong term because he was unfamiliar with African American hairstyles." But the fact that Seaton leveraged the term's relative obscurity to spin speculation does not detract from the fact that a fair-minded juror could reasonably dismiss such conjecture as unfounded. *See Ayala*, 135 S. Ct. at 2199. Moreover, Seaton's argument makes no sense, because the description Branon received—and which was before the jury—included the fact that the assailant's hair was "shoulder length." Thus, even if the jury entertained the far-fetched notion that the speaker said "Jheri-curl" when he meant "Afro," it was still faced with a clear conflict in the evidence: was the assailant's hair shoulder-length or in an Afro?

**2.** As to the bloody shoeprint evidence, the majority chides the Nevada Supreme Court for engaging in "pure speculation" for suggesting that the prints were probably left by Josy or Coe. To be sure, the evidence did not support such a conclusion. But neither did it suggest otherwise. Under AEDPA, our review is limited to the original trial record, *Pinholster*, 563 U.S. at 181, and nothing in that record indicates that the shoeprints were *not* those of Josy or Coe.

The majority buries this fundamental rule in a footnote, while simultaneously embarking on its own fact-finding mission, concluding that, based on its review of the images of the shoeprints, "the shoeprints appear to us larger than those of a typical woman's shoe." Tellingly, the majority cites no expert testimony from the trial record to support its observation—because there is none. Leading with its chin, the majority commits double error under AEDPA: not only does it draw its own evidentiary conclusions, *see Taylor*, 366 F.3d at 999, but it engages in the very "speculation" for which it roundly criticizes the Nevada Supreme Court.

Limiting our review to the trial record, as we must, the shoeprints' provenance is unknown. What *was* known at the time of trial, and what was presented to the jury, was the fact that the shoeprints did not match Browning. In other words, they pointed to someone else, which is consistent with the defense's theory that a black Cuban associate of the Wolfes committed the crime. Had the defense known that the prints predated the arrival of the first responders, its theory would have been the same. And to the extent the information had some exculpatory value by eliminating one innocuous explanation for the prints (i.e., that they were left by first responders), the record does not compel a conclusion that the information was material. Indeed, even had the jury known that first responders were not the source, it could have reasonably inferred that the prints may have been left by a person who was not the killer—e.g., Josy, Coe, or someone else entirely. Either way, while the jury was left speculating about the prints' origin, it knew that they did not incriminate Browning.

**3.** Finally, even if the shoeprint evidence, viewed in a vacuum, was significant, it is reasonably deemed immaterial

when considered collectively with the evidence inculpating Browning. We assess the combined effect of both undisclosed exculpatory evidence *and* the evidence that was before the jury as a whole in determining whether there is a "reasonable probability" that disclosure of *Brady* material would have changed the outcome. *See Kyles*, 514 U.S. at 437 (materiality of *Brady* evidence is judged according to the "net effect" of the evidence). As the Nevada Supreme Court found, substantial evidence inculpated Browning:

- ***Browning's fingerprints in the Elsens' store.*** Browning's fingerprints were found on the disturbed jewelry counter—both on the top side of the glass and on a fragment from the broken sliding-glass door on the vendor's side of the display case. The majority minimizes this fact, which it concedes is "probably the strongest evidence against Browning," by surmising various innocent explanations: the fingerprints could have predated the murder, Browning may have made the prints during the commission of the crime but someone else stabbed Hugo, or the other unidentified prints at the scene could belong to the true killer. But the jury could have easily drawn a contrary conclusion: the fact that Browning's prints were found on a piece of glass broken in the commission of the robbery-murder, and on the *vendor's* side of the glass case, points to his guilt. Combined with the other inculpatory evidence (discussed below), this would not have been an unreasonable inference. *Cf. Mikes v. Borg*, 947 F.2d 353, 361 (9th Cir. 1991) (fingerprints alone—absent evidence that they were made "during the commission of the crime"—are insufficient evidence of guilt where the government's case is "supported *solely* by evidence that the defendant's

fingerprints were found on th[e] object" (emphasis added)).

- *The eyewitness identifications*. Three eyewitnesses—Josy, Coe, and Woods—identified Browning as the person they saw in or near the Elsens' store around the time of the murder. The majority insists the identifications were "flawed" because Josy and Coe were at first equivocal, and the police used a suggestive "show up" identification procedure at the crime scene. But the majority ignores Josy's testimony that the person she saw raise a knife over her husband wore a blue "Hollywood" cap with a "puff[]" of hair protruding out the bottom—an account that fits with Coe's description of the alleged assailant, matches Browning's hairstyle at the time of his arrest, and is consistent with the fact that the same blue cap was found in a dumpster outside the Wolfes' motel room.[8] Moreover, Woods' contemporaneous identification of Browning was unequivocal. A fair-minded jurist could therefore reasonably conclude that the identifications were strong evidence of Browning's guilt.

- *The jewelry in the motel room*. Police officers discovered Browning with some of the stolen jewelry in the Wolfes' motel room shortly after the murder. The majority notes that Browning's fingerprints were not found on the stolen jewelry, and the rest of the loot was later turned over by the Wolfes. But the jury knew these

---

[8] The majority also does not acknowledge the fact that Coe's identification is consistent with Browning's own admission that he was walking south near the store. However, because Browning testified to this fact only in post-conviction proceedings, I do not consider it in the *Brady* analysis. *See Pinholster*, 563 U.S. at 181.

facts and was entitled to infer guilt from this evidence
when considered with the other evidence inculpating
Browning.

- ***Browning's Confession to Randy and Vanessa Wolfe***.
The Wolfes' testimony was devastating to the defense.
According to the Wolfes, Browning confessed to them to
committing the robbery-murder, and then asked Vanessa
to help cover it up.

    To be sure, the Wolfes' testimony was susceptible to
substantial impeachment.  They were habitual drug users
with prior convictions and a penchant for lying.  But all
of this was presented to the jury.  The jury learned that
Randy had a history of illegal drug use, used heroin four
days before testifying, stole property, used his wife's
prostitution to support his drug use, lied under oath in
Browning's case about keeping some of the stolen
jewelry, had three prior felony convictions, and was
awaiting sentencing in a pending case.  The jury was
entitled to credit the Wolfes' testimony notwithstanding
that the Wolfes were, by all accounts, thoroughly
unscrupulous characters.

    Tellingly, the majority provides no support for the
suggestion that the jury could *not* have reasonably
believed the Wolfes.  Instead, it speculates that perhaps
one more piece of exculpatory evidence—e.g., the source
of the bloody shoeprints—would have tipped the scales
for at least one juror.  But our role is not to reweigh the
evidence and make fresh credibility determinations.  *See
Williams v. Ryan*, 623 F.3d 1258, 1266 (9th Cir. 2010).
Because the jury was entitled to credit the Wolfes'
testimony, and because that testimony directly implicated

Browning as the murderer, a fair-minded jurist could have concluded that Browning's confession to the Wolfes was strong evidence of his guilt.

- ***The Knife.*** Vanessa Wolfe testified that she found Browning with a knife in her motel room, and that he asked her to help him dispose of it. If the jury believed her, this was compelling evidence inculpating Browning. Moreover, at trial, a prosecution expert testified that Hugo's injuries were "consistent" with wounds made by the knife, though he did not know whether the particular knife recovered by the police was the actual murder weapon.[9]

In sum, the jury had before it substantial evidence inculpating Browning. The majority concludes otherwise only by reweighing the evidence: by deciding that the Wolfes were not credible, dismissing the eyewitness identifications of Browning as "flawed," and minimizing the highly inculpatory fingerprint evidence.[10] In so doing, the majority

---

[9] In post-trial proceedings, the defense submitted an affidavit by Dr. William Chisum in which Dr. Chisum determined that Hugo's wounds did not "coherently coincide" with those of the recovered knife. But that testimony, at most, created a conflict in the evidence. And, at any rate, we are limited to considering the evidence that was before the trial court. *See Pinholster*, 563 U.S. at 181.

[10] The jury likely also considered the tan jacket found with Browning in the Wolfes' motel room, and which the prosecution identified as the jacket worn by Browning in a photograph shown to the jury. The jacket had Type B blood on it, which is the same blood type as Hugo. Prosecutor Seaton argued in his rebuttal closing argument that this "proves [Browning's] guilt probably as much as anything." Post-conviction forensic testing revealed, however, that the blood was not Hugo's. Seaton's statement was therefore unfairly prejudicial. Even so, the jury

ignores the presumption owed to the Nevada Supreme
Court's factual determinations and decides for itself the
strength of the case against Browning. *See Taylor*, 366 F.3d
at 1000. That is error. Considering the limited exculpatory
value of the shoeprint evidence, combined with the
substantial evidence pointing to Browning's guilt, the jury
could have convicted Browning even if it was presented with
the purported *Brady* material. The Nevada Supreme Court
was therefore not objectively unreasonable in rejecting
Browning's *Brady* claim.

> **b. Browning's Ineffective Assistance of Counsel
> Claim Fails Because the Nevada Supreme Court
> Was Not Objectively Unreasonable in Concluding
> That Pike Acted According to a Reasonable Trial
> Strategy**

To prevail on his IAC claim, Browning must show (i) that
his trial counsel's assistance fell below an objective standard
of reasonableness, and (ii) that but for his counsel's deficient
performance, there is a "reasonable probability that . . . the
result of the proceeding would have been different."
*Strickland v. Washington*, 466 U.S. 668, 691–94 (1984);
*accord Hinton v. Alabama*, 134 S. Ct. 1081, 1087–88 (2014);
*Wiggins*, 539 U.S. at 521. "A reasonable probability is a
probability sufficient to undermine confidence in the
outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)
(internal quotation marks omitted). This is a rigorous
standard. The defendant must show both that "counsel made
errors so serious that counsel was not functioning as the

---

was not left with the unassailable impression that the blood was, in fact,
Hugo's. Indeed, Seaton conceded that "[t]here are *other people* in this
world with B blood."

'counsel' guaranteed the defendant by the Sixth Amendment," *and* that the "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

The Nevada Supreme Court decided Browning's IAC claim on the merits, and therefore our review is governed by AEDPA's deferential review standard. *See Johnson*, 133 S. Ct. at 1094. Because we must also afford counsel's performance a presumption of reasonableness, *Strickland*, 466 U.S. at 690, claims of IAC under AEDPA are "doubly deferential." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003). When applying *Strickland* in the AEDPA context, the question is "whether there is a reasonable argument that counsel satisfied *Strickland*'s deferential standard, such that the state court's rejection of the IAC claim was not an unreasonable application of *Strickland*." *Murray v. Schriro*, 746 F.3d 418, 465–66 (9th Cir. 2014) (internal quotation marks and citation omitted).

Browning contends that his trial counsel, Randall Pike, provided ineffective assistance because he (i) did not interview Officer Branon and learn about Hugo's description of his assailant's hairstyle, (ii) did not investigate the source of the bloody shoeprints; and (iii) did not interview the Wolfes. The Nevada Supreme Court agreed on (i), but not on (ii) or (iii). As to (i), the Nevada Supreme Court held that the deficiency was not prejudicial because the hairstyle evidence was "extensively explored at trial."[11] *Browning*, 91 P.3d at 46.

---

[11] I agree with the majority that we must review Pike's performance *as a whole*, and that the district court erred in granting COAs only on specific aspects of Pike's alleged deficient performance. *See* 28 U.S.C. § 2253(c)(2); *see also Wong v. Belmontes*, 558 U.S. 15, 17 (2009).

### i. The Hairstyle Evidence

The Nevada Supreme Court noted that, while Pike's performance in not discovering Hugo's true description of his assailant's hair was deficient, the evidentiary conflict was squarely before the jury. *See id.* It concluded that, in light of the conflicting testimony, combined with the "strong evidence of Browning's guilt," there was "no reasonable probability of a different result if counsel had discovered and presented the evidence that 'j[h]eri-curl' was the officer's term, not the victim's." *Id.*

Under AEDPA, our task is to decide whether the Nevada Supreme Court's conclusion that Pike's deficient performance did not prejudice Browning's defense was objectively unreasonable. The majority concludes that it is, noting that "Hugo's description of his assailant's hair is powerful evidence of Browning's innocence." But, as described in the context of Browning's *Brady* claim (*see* Part IV.a, *supra*), the jury *did* hear Hugo's description of his killer's hair, and so the conflict between his account and the accounts of Josy and Coe was squarely presented. The only question is whether there exists a reasonable probability that the jury would have acquitted Browning had it known that "Jheri curl" was Branon's term and not Hugo's. For the reasons already discussed, the Nevada Supreme Court's determination was not objectively unreasonable because the hairstyle evidence could reasonably be viewed as not exculpatory.

### ii. The Bloody Shoeprint Evidence

The Nevada Supreme Court held that it was not deficient performance for Pike to forgo investigating the actual source

of the bloody shoeprints. *Id.* at 46. In the post-conviction proceeding, Pike explained that his decision was part of a strategy to "overcast[] a shadow of a doubt," by pointing to someone else—a black Cuban associate of the Wolfes—as the assailant. If he had investigated the true source of the shoeprints, he may have discovered that someone other than the killer—e.g., a first responder—was the true source, which would have undercut this theory. The Nevada Supreme Court reasoned that "[a]s long as the source of the prints was unknown, [Pike] could argue to the jury that the actual murderer had left them." *Browning*, 91 P.3d at 46.

The Nevada Supreme Court was not objectively unreasonable in concluding that Pike executed a reasonable trial strategy based on his investigation of the evidence. An attorney's decision must be "evaluate[d] . . . from counsel's perspective at the time" of the decision, thereby "eliminat[ing] the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. At the time of trial, Pike had gathered enough information to know that the shoeprints did not match his client. It was an open question whether first responders, Josy, Coe, or someone else was the source. Interviewing first responders about their shoes could have resulted in the discovery that a first responder *was* the source. This is therefore not, as the majority insists, an "extreme instance of strategy determining investigation." To the contrary, it is an example of trial counsel making a "strategic choice[]" after "less than complete investigation" that is rooted in a sound theory of the defense. *See Strickland*, 466 U.S. at 690–91.

The majority relies on *Weeden v. Johnson*, 854 F.3d 1063 (9th Cir. 2017), but that case is not on point. There, a split panel of this court considered counsel's failure to obtain a psychological evaluation of the defendant. *Id.* at 1067–68.

The defendant had been convicted of attempted robbery and first degree felony-murder after a botched robbery attempt resulted in the victim's death. *Id.* at 1067. Because the defendant was not present at the crime scene, the prosecution pressed the theory that she planned and facilitated the crime. *Id.* at 1066, 1070. Thus, the defendant's "mental condition was an essential factor in deciding whether she actually had the required mental states for the crime." *Id.* at 1070. Yet defense counsel did not pursue psychological evidence that could have shown that the defendant lacked the requisite mental capacity to plan the robbery. *Id.* at 1068–69. He argued that it was a reasonable tactic to remain ignorant because a psychological profile could have revealed that his client was easily manipulated. *Id.* That may have given the prosecution an opening to argue that even if the defendant "did not understand the magnitude of the robbery, she nonetheless went along with it." *Id.* (internal quotation marks omitted).

The court held that defense counsel had unreasonably "put[] the cart before the horse" by allowing trial strategy to dictate the scope of the investigation. *Id.* at 1070. While I stand by my dissent in *Weeden*, even on the *Weeden* majority's own terms that case is distinguishable in relevant part. There, counsel conducted *no* investigation on an issue that was central to the prosecution's burden of proof. *See id.* Here, by contrast, Pike collected enough information to know that the shoeprints did not match his client, and this discovery supported his trial strategy of arguing that someone else committed the murder.

Moreover, unlike the defendant's psychological competency in *Weeden*, the importance of discovering the source of the shoeprints was not evident until Branon

revealed—some 15 years later—that the prints predated his arrival at the scene. At the time of trial, Pike knew that the prints were exculpatory because they did not match his client, and there was no reason to believe that someone *other than* the true killer was the source. Indeed, Pike may have reasonably assumed that first responders would have exercised care to preserve the crime scene. The fact that first responders did *not* make the prints only became relevant after Horn's testimony suggested that they *may* have been the source. Whether Pike performed adequately is a measure of his own actions in preparing for trial, not a function of misleading testimony introduced by the prosecution. Had Horn not testified about first responders' shoe preferences, Browning would have no claim of deficient performance based on the shoeprint evidence. To the contrary, Pike made clear to the jury the shoeprints' *exculpatory* value.

The majority's reasoning also creates a tension between the prosecution's *Brady* obligations and defense counsel's performance responsibilities. A *Brady* violation occurs where the prosecution fails to turn over evidence requested by the defense, or where it fails to "*volunteer* exculpatory evidence *never requested*." *Kyles*, 514 U.S. at 433 (emphasis added); *see Strickler*, 527 U.S. at 280. The underlying premise is that some evidence is discoverable by diligent inquiry, while other evidence is not. The shoeprint evidence falls into the latter category because, until Horn's testimony, Pike reasonably did not think to ask whether the prints were left by someone other than the killer. Boiled down, Browning's grievance reduces to a *Brady*, not an IAC, claim.

Finally, in *Weeden*, even if counsel had obtained a psychological report that was unfavorable to his theory of the case, he was not required to disclose it to the prosecution.

854 F.3d at 1070. Nor would an adverse psychological finding have precluded him from arguing, as he did, that the defendant, a 14-year-old girl, could be "easily manipulated by older people" because of her age. *See id.* at 1067 (internal quotation marks omitted). Thus, he arguably had nothing to lose but potentially much to gain by investigating his client's psychological profile. Here, by contrast, had Pike discovered that first responders were actually responsible for the shoeprints, this would have undercut his argument that a black Cuban was the true killer.[12]

The majority's reliance on *Harrington v. Richter*, a case in which the Supreme Court rejected an IAC claim, is equally puzzling. There, the Court—reversing an en banc decision of this court—upheld a state court's ruling that defense counsel's failure to test blood evidence was a reasonable trial strategy. *Richter*, 562 U.S. at 107–08. Had defense counsel tested the blood, he would have discovered—as post-conviction results revealed—that the evidence supported the defendant's version of events. *See id.* But without the benefit of hindsight, defense counsel faced two possible outcomes from a blood test: a result that corroborated his client's account and one that undermined it. *See id.* at 108. Faced with the "serious risk[]" of an adverse test result, the

---

[12] To be sure, it appears that Pike never connected the shoeprints directly to the enigmatic black Cuban. This renders his post-trial explanation for not investigating the prints somewhat suspect. Even so, our task is not to review Pike's performance as if on a direct appeal or to second-guess his intent at the time of trial. We may only reject the state court's determination if Pike's decision cannot be construed by a fair-minded jurist as a "sound trial strategy." *See Strickland*, 466 U.S. at 689; *see also Richter*, 562 U.S. at 110 ("*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

Court held that the attorney was not required to "pursue an investigation that . . . might be harmful to the defense." *Id.*

Pike faced a similar dilemma here. Investigating the bloody shoeprints could have bolstered his theory—and Browning's account—that a black Cuban murdered Hugo, or it could have undermined it.[13] Only in the "harsh light of hindsight" does Pike's strategy appear unreasonable. As in *Richter*, "[i]t was at least arguable that a reasonable attorney could decide to forgo inquiry into the [shoeprint] evidence in the circumstances here." *See Richter*, 562 U.S. at 106.

The majority distinguishes *Richter* on the ground that defense counsel there did not completely trust his client's

---

[13] The majority speculates that Pike had nothing to lose by interviewing Branon because no matter what Branon said, that "still would have inflicted no harm on [Pike's] theory" that the black Cuban committed the murder. Not necessarily. In response to a question about whether first responders entered the store before Branon's arrival, Pike could not have ensured that Branon would answer with a simple "yes" and nothing more, as the majority assumes. Branon may very well have elaborated, saying something like: "Yes, and they're the reason why there were bloody shoeprints all over the place." This observation also disposes of Browning's argument that Pike should have asked Branon about the prints after Horn's testimony indicated that they may have been left by first responders. Browning suggests that, at that point, at worst Branon could have confirmed Horn's testimony. But Horn did not testify that the first responders *had* made the prints. He only observed that first responders wear tennis shoes to crime scenes. Thus, even after Horn's testimony, Pike could plausibly argue his black-Cuban-did-it theory. Had Pike asked Branon about what he saw when he arrived at the scene, and had Branon told him that the first responders were the source of the prints, Pike would have had significantly less latitude to press this defense. All this is to say that a fair-minded jurist could conclude that Pike was reasonable in seeking to avoid obtaining the shoeprint information by not interviewing Branon.

version of events. *Id.* at 108. According to the majority, this distinction makes all the difference because, here, "Pike had no reason to disbelieve Browning's assertions that he had been framed by the Wolfes."[14] But *Richter* does not teeter on so thin a reed. That counsel there "had reason to question the truth of his client's account" was only one factor considered by the Court. *See id.* at 108 (noting that "*[e]ven apart from* th[e] danger" that the defendant was lying, testing the blood could have "shift[ed] attention to esoteric matters of forensic science, distract the jury from whether Johnson was telling the truth, or transform the case into a battle of the experts" (emphasis added)). Ultimately, the Court rejected the IAC claim because defense counsel's tactic was consistent with a strategy of "try[ing] to cast pervasive suspicion of doubt [rather] than to strive to prove a certainty that exonerates." *Id.* at 109. Same here. Pike, in his words, executed a strategy of "overcasting a shadow of doubt, as opposed to proving." The Nevada Supreme Court's determination that Pike's performance was not deficient for failing to discover the shoeprint evidence was therefore not objectively unreasonable. *See Browning*, 91 P.3d at 46.

---

[14] The majority also makes the bald allegation that Pike "thought Browning was guilty." The record does not appear to support this statement, yet it is key to the majority's ominous warning that condoning Pike's strategy would result in blanket cover for attorneys who shirk their investigatory obligations. The majority reasons that defense counsel need merely cite a belief that their clients are untrustworthy to justify conducting little or no investigation. This is a red herring: The issue is not whether Pike believed Browning was guilty; it is whether Pike's trial strategy made sense. Had Pike's decision to forgo further investigation of the shoeprints' provenance been untethered to any potential benefit to his client, that decision may very well have constituted inadequate performance. But, as explained, that is not the case.

### iii. The Wolfes

The Nevada Supreme Court concluded that Pike acted reasonably in not interviewing the Wolfes. *Browning*, 91 P.3d at 46. The court noted Pike's policy of delegating the responsibility of interviewing witnesses to his investigator rather than conducting interviews himself, which could have made Pike a percipient witness. *Id.* The court concluded that this was a "reasonable tactic." *Id.* But Pike's investigator never interviewed the Wolfes. While he sought permission to do so, Pike denied his requests. The Nevada Supreme Court's conclusion that Browning "has failed to show that counsel was ineffective" because it was "reasonable" to delegate interview responsibility to an investigator was therefore an unreasonable determination of the facts. *See id.*; 28 U.S.C. § 2254(d)(2).

Even so, the Nevada Supreme Court's ultimate conclusion was not unreasonable because Browning fails to show prejudice. *See Richter*, 562 U.S. at 88. Assuming it was deficient performance to not interview the Wolfes, it is unclear how any additional information that Pike may have uncovered would have likely changed the outcome of the trial. As the majority correctly notes, the jury was presented with a "mountain of evidence providing potential reasons to doubt the Wolfes' credibility."[15] The jury knew that the Wolfes had a history of lying, stealing, drug use, and prior convictions. Piling on one more bad act would have simply added to the already formidable "mountain." *See Lewis v. Cardwell*, 609 F.2d 926, 928 (9th Cir. 1979) (counsel's

---

[15] The record indicates that Pike was told, prior to trial, that the Wolfes had, on another occasion, falsely accused someone of committing crimes against Vanessa Wolfe.

failure to discover impeachment evidence that was merely cumulative did not prejudice the defendant).

Because Browning fails to show how interviewing the Wolfes would have resulted in a "reasonable probability" of a different outcome, the Nevada Supreme Court was not objectively unreasonable in rejecting Browning's IAC claim on this ground.

## V. Conclusion

The role of the federal judiciary in reviewing habeas petitions from state courts is limited, and for good reason. AEDPA, when properly applied, prevents federal courts from unnecessarily intruding on states' broad authority to administer their own criminal justice systems. That is why we are tasked with considering not whether we would decide a case differently, but whether the state court's determination is beyond fair-minded debate. Today's majority repeatedly loses sight of this standard. In light of the substantial evidence inculpating Paul Browning in Hugo Elsen's murder, the limited exculpatory value of the alleged *Brady* material, and the fact that Pike's representation reasonably did not prejudice Browning's defense, I would affirm the district court's denial of Browning's petition for habeas relief. I respectfully dissent.